700 F.2d 1143
 JEFFERSON NATIONAL BANK OF MIAMI BEACH, as the Personal
Representative of the Estate of Philip Litner,
Deceased, Plaintiff-Appellee,
v.
CENTRAL NATIONAL BANK IN CHICAGO, Defendant and Third-Party
Plaintiff-Appellant,
v.
Jerry LITNER, Third-Party Defendant-Appellee.
 No. 82-1427.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 29, 1982.
Decided Feb. 25, 1983.
 
 Francis J. Higgins, Bell, Boyd & Lloyd, Chicago, Ill., for defendant and third-party plaintiff-appellant.
 Morris J. Coff, Holleb & Coff, Ltd., Chicago, Ill., for plaintiff-appellee.
 Before CUMMINGS, Chief Judge, COFFEY, Circuit Judge, and HILL, Senior District Judge.*
 COFFEY, Circuit Judge.
 
 
 1
 This diversity action was brought by the corporate Personal Representative of the Estate of Philip Litner, Jefferson National Bank of Miami Beach, for the benefit of the beneficiaries under the decedent's will. The Personal Representative claims that the defendant corporate Trustee, "Central National Bank in Chicago," breached the fiduciary duty it owed to Mr. Philip Litner by failing to act prudently and conscientiously with the best interest of Philip paramount during the entire period the defendant acted as Trustee of the decedent's revocable inter vivos trust. The Trustee filed a third-party complaint against the decedent's son, Jerry Litner, seeking indemnification from any losses that it might suffer as a result of the Personal Representative's lawsuit. The Trustee maintains that the son wrongfully represented that he had the authority to act as the decedent's agent. Following a jury trial in the district court, verdicts were returned in favor of the Personal Representative and the decedent's son. Actual damages were assessed against the Trustee in the amount of $394,475.40, while punitive damages were denied. We AFFIRM.
 
 FACTS
 
 2
 On August 2, 1968, Philip Litner retired from his post as Chief Executive Officer of a subsidiary of Curtis Electro Corporation ("Curtis"),[1] resigned as an officer of Curtis and sold all of his Curtis stock to the corporation. Although its common stock was publicly traded, the Curtis Electro Corporation was controlled by members of the Litner family. Philip's brothers and son were not only directors of the corporation but also occupied senior management positions.
 
 
 3
 Curtis agreed to purchase the stock of Philip Litner for $511,560. At the time of sale, Philip Litner received a cash down payment of $148,352.40 and an unsecured promissory note of $363,207.60 for the remaining balance bearing interest at 5 percent and calling for payment of the principal in three installments: one payment due on January 2, 1969; one on January 2, 1971; and the last payment due January 2, 1972. Curtis made the first installment to Philip Litner, but failed to make the two remaining payments of $127,890 each.
 
 
 4
 William Purcell, a vice president of plaintiff-appellant "Central National Bank in Chicago" ("Central"), called on Philip Litner shortly after he sold his Curtis stock. At this time, Mr. Purcell, responsible for the development of new trust business for Central, suggested to Philip that he consider establishing a "revocable living trust" for estate planning purposes.[2] Philip Litner expressed concerns regarding the administration of the trust and Purcell agreed that the Trustee would consult him (Philip) before making any investment decisions. Mr. Purcell supported this agreement with a statement that the bank would not exercise investment control without Mr. Litner's permission.[3]
 
 
 5
 Philip requested that Central supply Eli Fink (Philip's attorney) with a proposed trust agreement. Mr. Fink and an attorney for Central negotiated the language to be contained in the agreement creating the inter vivos trust and on September 25, 1969, Philip Litner and a representative of Central signed the agreement designating Central as the Trustee of "Philip Litner Trust No. 1." ("Trust"). During his lifetime, Philip was to be the sole beneficiary of the Trust and upon his death new trusts were to be established for the benefit of his wife and children. The initial Trust corpus consisted of Curtis Electro's promissory note of $255,780 and, in addition, other securities valued at approximately $220,000.
 
 
 6
 From September of 1969 until January of 1971, Central communicated with Philip Litner concerning Trust investments and on one occasion Mr. Litner gave Central written approval of an investment change. Prior to January 17, 1971, there was limited discussion between Central and Philip Litner regarding the Curtis promissory note.
 
 
 7
 On January 17, 1971, Philip Litner suffered a severe stroke, was hospitalized for several weeks and thereafter was confined to a nursing home for temporary care. The residuals of this stroke were rather severe in that Philip Litner was left partially paralyzed and no longer able to speak. On or about January 25, 1971, Jerry Litner (Philip's son)[4] contacted Central and informed the bank that his father had suffered a stroke and was in a coma. The following month, Jerry Litner met with various officers of Central and advised them of his father's disability, reciting that his father could comprehend what was going on about him but was only able to communicate through physical gestures. At this time, Jerry Litner expressed concern about how his father's increased medical, personal and living expenses would be paid. After discussion, an agreement was reached whereby the Trustee would make monthly disbursements to Betty (Philip's wife) and she, in turn, would take care of the expenses.
 
 
 8
 Because Curtis Electro suffered economic difficulties they were unable to make the January 2, 1971 note payment due to cash flow problems. In lieu thereof, Curtis executed a new two-year promissory note in the amount of $127,890 bearing interest at the prime rate. On or about March 15, 1971, Central, as Trustee, agreed to the substitution of a replacement note for the then due cash payment.
 
 
 9
 Subsequent to Jerry Litner's advising the Trustee of his father's condition, Central took no action to ascertain on its own the mental condition or competency of Philip Litner. Even though Philip was the sole beneficiary of the Trust, Central never communicated, or attempted to communicate, directly with him about the Trust for several years after his stroke. Instead of consulting with Philip, Trust matters were communicated to Jerry and Betty Litner. Monthly Trust statements were forwarded to Betty Litner and monthly Trust income payments were deposited in her bank account without obtaining Philip's approval. On several occasions between 1971 and 1973, investment recommendations for the Trust were also forwarded to Betty Litner and she indicated her approval of the same on Central's written consent forms.
 
 
 10
 As Curtis Electro's principal lender, Central entered into a commercial loan agreement which provided Curtis with an unsecured revolving line of credit in the amount of $1,500,000 for general business purposes. It should be noted that Philip Litner was personally aware of the Curtis loan agreement and of Central's position as principal commercial banker of Curtis at the time he designated the bank as Trustee. During the late 1960s and prior to August of 1972, pursuant to the revolving credit agreement, Central made unsecured loans to Curtis, the parent company, without taking collateral or obligating the subsidiaries in any way. The loan agreement with Central prohibited Curtis from pledging, mortgaging, encumbering or otherwise granting any security interest in any of Curtis' properties without the prior written approval of Central.
 
 
 11
 In 1970, Curtis lost in excess of $700,000 and, thereafter, was unable to meet its financial obligations as its economic well-being continued to deteriorate. At the September, 1971, meeting of the Curtis Board, attended by Jerry Litner and Michael Gaffigan, Curtis director and Central commercial loan officer, the payment of the third installment obligation on the Philip Litner note was discussed. The Curtis directors determined that due to the corporation's severe financial problems the payment could not be made and the Trustees should be contacted to negotiate a modification of the note obligation. Subsequently, Jerry Litner informed Bruce Duff, Central National's account administrator for the Trust, that Central would be contacted by Curtis concerning the company's cash flow problem vis-a-vis the January, 1972 note payment and urged him to "work out an arrangement" with the company.
 
 
 12
 Prior to being contacted by Curtis, Mr. Duff questioned Mr. Gaffigan regarding Curtis Electro Corporation's relationship with Central's Commercial Lending Department. Duff, the Litner Trust officer, was informed by Gaffigan that Curtis was a "good customer" of the bank and had been since 1968. On or about March 15, 1972, Central, acting as Trustee of the Litner Trust, and Curtis entered into a new repayment agreement and canceled the Curtis notes then held by the Trustee. The new repayment agreement provided for a five-year $255,780 unsecured note bearing an increased interest rate of seven and one-half percent. As a concession to Curtis, the monthly payments on the note were initially set at $2,000 per month and were to be increased during the term of the note.
 
 
 13
 On August 18, 1972, Central, again acting as Curtis' commercial lender, and Curtis Electro entered into an additional commercial loan agreement whereby, in contrast to the earlier agreements, each of the Curtis subsidiaries gave notes to Central for the entire amount then owed by Curtis, $1,900,000, and the bank obtained a security interest in the equipment of the subsidiaries. To further protect themselves as Curtis' banker, Central obtained a security interest in one hundred percent (100%) of the stock of the Curtis subsidiaries.
 
 
 14
 Late in June of 1973, Mr. Duff discovered that Curtis was in default on the March 15, 1972 promissory note. On several occasions Mr. Duff contacted Curtis regarding the default and Mr. William Robinson, Curtis' Chief Financial Officer, informed Duff that the company was in a "very deep cash crisis" and would be unable to make the regular monthly payments on the Trust's note. Two months later, in August of 1973, Duff received two checks from Curtis making the interest payments current on the note's then outstanding principal balance.
 
 
 15
 As Central was aware of Curtis' continuing severe financial problems, it now saw fit to protect itself as commercial banker by acquiring and perfecting security interests in additional collateral in conjunction with a September, 1973 business loan to one of Curtis' subsidiaries. Although this loan was repaid shortly thereafter, the additional collateral was retained and continued to secure loans Central had previously made to Curtis.
 
 
 16
 During December of 1973, Bruce Duff and members of the Special Assets Committee of Central's Trust Department discussed the advisability of retaining an attorney to initiate collection of the Curtis promissory note. Toward the end of that month, Mr. Duff contacted Attorney Fink (Philip's lawyer) and discussed with him the problems the Trust was having obtaining payment of the promissory note from Curtis.
 
 
 17
 The next month, on January 7, 1974, Duff informed Curtis that the Trust was considering retaining an attorney to commence litigation to collect the Curtis debt. Curtis management informed Duff that if a lawsuit were filed it would force Curtis into bankruptcy and, furthermore, all of Curtis' assets had previously been pledged to Central to secure its commercial loans.[5] Based on this information, Duff and Curtis then agreed the Trust would not file suit and Curtis would bring the interest payments up to a current status. Attorney Fink was advised by letter to take no legal action.
 
 
 18
 Three months later, on April 29, 1974, Curtis filed a Chapter 11 bankruptcy petition for reorganization. After the filing of the petition, Mr. Duff concluded that Central was facing a "potential conflict of interest" dilemma as Trustee, due to the problem existing between Curtis' secured and unsecured creditors. Mr. Duff informed the Litner family by letter of May 24, 1974 that it was the opinion of Central's top management that independent counsel should now be obtained by the Litner family to seek collection of the note as "vigorously as possible." Central stated that it did not recommend attempting the appointment of a successor trustee for the Litner Trust in view of the "questionable competency" of Philip Litner.[6]
 
 
 19
 In the summer of 1974, Jerry Litner informed Bruce Duff that it was the opinion of the Litner family that Central should absorb any loss inuring to the Trust as a result of Curtis' insolvency. Mr. Duff replied that Central had not acted improperly and had only relied on his (Jerry Litner's) advice. In early August 1974, the Litner family contemplated filing an action on behalf of Philip Litner against Central as Trustee of the Litner Trust.
 
 
 20
 Prior to his death on September 5, 1976, Philip Litner revoked the Trust and ordered the Trust assets transferred to Jefferson National Bank of Miami ("Jefferson National"), the plaintiff-appellee herein.[7] On May 1, 1978, Jefferson National, as Personal Representative of the Estate of Philip Litner, instituted the instant action and alleged, as noted above, that Central had breached the fiduciary relationship owed to Philip Litner while it acted as Trustee of the Litner Trust and sought recovery of actual and punitive damages. As referred to above, Central subsequently answered and filed a third-party complaint against Jerry Litner for reimbursement of any damages that might be recovered by Jefferson National. After a lengthy jury trial, judgment was entered in favor of Jefferson National in the amount of $394,475.40. The jury further determined there was no liability on the part of Jerry Litner and the trial court entered judgment accordingly. This appeal followed.
 
 ISSUES
 
 21
 Issue 1: Did the district court commit error in determining that Jefferson National's action was of a legal nature and properly triable to a jury?
 
 
 22
 Issue 2: Did the district court commit error in determining that Jefferson National's action was not barred by the doctrine of laches or the applicable statute of limitations?
 
 
 23
 Issue 3: Did the district court improperly instruct the jury as to the standard of care expected of Central while acting as Trustee of the Philip Litner Trust?
 
 
 24
 Issue 4: Did the district court improperly instruct the jury on the issue of the proper measure of damages recoverable by Jefferson National?
 
 
 25
 Issue 5: Did the district court commit error in directing a verdict in favor of third-party defendant Jerry Litner after the jury had found in his favor?
 
 RIGHT TO JURY TRIAL
 
 26
 The complaint of Jefferson National included a request for a trial by jury. Central challenged the request and filed a motion to strike the jury demand based on Central's contention that the action was inherently and exclusively of an equitable nature and properly tried to a court. Chief Judge McGarr determined that since the Personal Representative was seeking immediate and unconditional payment of damages, they (Jefferson National) were entitled to maintain an action at law against the Trustee. We agree with Jefferson National and hold that Central's motion to strike the jury demand was properly denied by the trial court.
 
 
 27
 The right to a jury trial in federal diversity actions is to be determined as a matter of federal law. Simler v. Conner, 372 U.S. 221, 222, 83 S.Ct. 609, 610, 9 L.Ed.2d 691 (1963). The United States Constitution, Article III, Section 2, provides: "The judicial Power shall extend to all Cases, in Law and Equity." The constitutional basis for the right to a jury trial is set forth in the Seventh Amendment:
 
 
 28
 "In Suits at common law, where the value in controversy shall exceed twenty-dollars, the right of trial by jury shall be preserved."
 
 
 29
 The Federal Rules of Civil Procedure safeguard the constitutional right to a jury trial of legal issues. Fed.R.Civ.P. 38 and 39.
 
 
 30
 The merger of the federal courts of law and equity has caused some uncertainty in the determination of jury trial rights. In Ross v. Bernhard, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970), the Supreme Court outlined a test to be used to define the scope of Seventh Amendment rights. The Ross Court identified three criteria that should be considered in determining the "legal" nature of an action: (1) the historical characterization of the claim; (2) the remedy sought; and, (3) the practical abilities and limitations of juries. Indeed, not only did the Court identify the second and third criteria; it also implied, without expressly stating, that history may be a less reliable guide than the other two. See Rogers v. Loether, 467 F.2d 1110, 1118 (7th Cir.1972), aff'd sub nom., Curtis v. Loether, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974).
 
 
 31
 Traditionally, the remedies of the beneficiary of a trust against the trustee have been almost exclusively within the jurisdiction of equity. Restatement (Second) of Trusts Sec. 197 (1959). However, we hold there are limited instances in which the beneficiary may maintain an action at law against the trustee as in the instant case. Restatement (Second) of Trusts Sec. 198(1) (1959) reads in pertinent part:
 
 
 32
 "If a trustee is under a duty to pay money immediately to the beneficiary, the beneficiary can maintain an action at law against the trustee to enforce payment."
 
 
 33
 Comment (d) to Section 198 is relevant to our determination of whether the district court properly concluded that Jefferson National's complaint was subject to jury consideration. This comment states:
 
 
 34
 "If the trustee misappropriates money which it is his duty to continue to hold in trust, the beneficiary, not being entitled to immediate payment, cannot maintain an action at law against the trustee. His remedy is a suit in equity to compel the trustee to restore the money misappropriated and to hold it in trust or to pay it to a new trustee. If, however, the trustee is first removed and a new trustee is appointed, the new trustee can maintain an action at law against him to recover the amount misappropriated, since he is under a duty to pay the money immediately and unconditionally to the new trustee."
 
 
 35
 (emphasis added).
 
 
 36
 Analogously, we believe the instant action is of the type that a beneficiary may maintain at law against a trustee. This is not a suit in equity to compel the trustee to redress a breach of trust by placing a certain amount of money back into the trust corpus but rather a suit for immediate payment on an indebtedness arising out of a breach of trust.
 
 
 37
 In his memorandum opinion denying Central's motion, Judge McGarr cited the Dixon v. Northwestern National Bank, 297 F.Supp. 485 (D.Minn.1969), decision extensively. In particular, the district court found the following analysis to be persuasive:"It also may be said in this case that there exists an adequate remedy at law. A jury hearing all the evidence may or may not as the case may be return a monetary judgment in favor of the plaintiffs. If plaintiffs are successful, the trustee is under a duty to pay the beneficiaries immediately and unconditionally. This case is thus distinguishable from the more normal situation where the beneficiaries are suing in equity to compel the trustee to redress a breach of trust by refunding to the trust estate and where there is no right to a jury trial. In the latter situation, a jury cannot award monetary relief, or any other relief, because the trustee is under no obligation to make immediate payment. Rather equitable relief compelling the trustee to restore the corpus must be decreed. However, once the beneficiaries have a vested right to payment or when the trustee is obligated under the terms of the trust to make a distribution to the beneficiaries, then the beneficiaries are entitled to immediate payment and may maintain an action of law against the trustee. In close cases where there is a doubt, it is the court's reading of the teachings in Dairy Queen, Inc. [v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) ], supra, and other cases that the court should favor of the granting of a jury trial to insure constitutional rights."
 
 
 38
 Id. at 489.
 
 
 39
 The issue in this case does not involve the administration of an existing and continuing trust. Philip Litner Trust No. 1 was validly revoked in July of 1975 and Central was obligated at that time to deliver all of the Trust assets to Jefferson National. Jefferson National seeks recovery on behalf of Philip Litner's estate of an indebtedness that arose as a result of Central's actions while acting as Trustee of the Litner Trust. In its complaint, Jefferson National contended that Central is presently and unconditionally obligated to pay the Personal Representative a determinable sum of money to which the beneficiaries under the will of Philip Litner are immediately entitled. We agree with the trial court that these issues were properly triable before the jury as Jefferson's claim was an action at law. The controlling issues herein--whether Central was guilty of wrongful conduct by breaching the trust reposed in it by Philip Litner, whether such conduct was the proximate cause of injury to Philip Litner, and the amount of the injury--are issues which are properly within the province of a jury to determine.
 
 
 40
 The second part of the Ross test requires an inquiry into the nature of the remedy sought to ascertain whether a plaintiff seeks legal or equitable relief. The remedy sought by Jefferson National, in essence, is the immediate payment of money damages to the estate of a beneficiary of a previously revoked trust. The court is not called upon to invoke powers of an equitable nature such as demanding an accounting, enjoining future action or maintaining jurisdiction to supervise the future administration of the trust for the Trust was legally revoked in July of 1975.
 
 
 41
 Consideration of the practical limitations of a jury trial, required by the third part of the Ross test, does not preclude a jury trial in this case. As noted above, the issues considered by the jury are of a type commonly delegated to a jury for determination. The "practical abilities and limitations of juries" present no obstacle to the determination of the issues presented in a breach of duty case such as this. The issues considered by the jury in this case involved the standard of care expected of a trustee, whether it was breached by Central and what, if any, damages were suffered by the Estate of Philip Litner.
 
 
 42
 Under the three prong test of Ross, both the character of the issues involved and the relief sought compel this court to conclude that Jefferson National was entitled to a trial by jury. Additionally, there is a clear federal policy in light of the Seventh Amendment favoring jury trials and in doubtful cases jury trials should be favored. 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2302 at 21 (1971).TIMELINESS OF ACTION
 
 
 43
 Central maintains the claim brought on behalf of the Estate of Philip Litner by Jefferson National was time-barred either under the equitable doctrine of laches or the applicable Illinois statute of limitations. As we have previously discussed, Jefferson National's claim is of a legal nature and not an action in equity, thus, Central cannot invoke the defense of laches. In re O'Donnell's Estate, 8 Ill.App.2d 348, 132 N.E.2d 74, 77 (1956). As Central did not clearly repudiate its trusteeship of the Philip Litner Trust until early 1974, the claim was not barred by the Illinois Limitations Act.[8]
 
 
 44
 The rule in Illinois with respect to the statute of limitations and express trusts was clearly stated in Kay v. Village of Mundelein, 36 Ill.App.3d 433, 344 N.E.2d 29, 33 (1975), as follows:
 
 
 45
 "[D]uring performance of the express trust there is no cause of action for breach and so the statute of limitations has no bearing on the rights of the beneficiary; but if the trustee violates the trust and the beneficiary knows of such conduct, or could have learned of it by the use of reasonable diligence, the court will apply the statute of limitations. To cause the statute to begin running during the life of the trust there must be some act of repudiation of the trust by the trustee ... He must in some way notify the beneficiary of his treachery. Concealed repudiation does not count."
 
 
 46
 (citations omitted).
 
 
 47
 Central seeks to use Ill.Rev.Stat. ch. 83, Sec. 16, as a shield by asserting that Jefferson National's lawsuit was filed more than five years after the occurrence of numerous instances of alleged wrongful conduct. Central correctly points out that some of the challenged actions, including acceptance of the two replacement notes (renegotiated while Curtis was in financial difficulty) and the securing of Central's commercial loans, occurred prior to 1973. However, in a case such as this where Central's activities were unknown to the beneficiary of the Trust, Philip Litner, and he was not aware of facts which would reasonably put him on notice of Central's direct conflict of interest, to now allow Central to hide behind the statute of limitations would reward it for the secrecy of its unfaithfulness.
 
 
 48
 It is significant that Bruce Duff, Central's trust officer handling the Litner Trust, was not aware of Central's secured status as Curtis' commercial lender until early 1974. After discovering the conflict of interest of Central as secured commercial lender of Curtis and also as an unsecured Trustee creditor of Curtis, Duff promptly and properly informed the Litner family of the bank's unfaithfulness, conflict of interest and lack of ability to vigorously pursue the collection of the Trust's note. We agree with Judge McGarr's finding that "the full awareness of the rights of [Philip Litner] came to [the Litner family], at the earliest, some time in early or mid-1974." T.R. 2608. As a matter of law, Philip Litner or the representative of his estate had at least five years from this date, the date of Central's repudiation, within which to file suit.
 
 
 49
 Until Central repudiated the trust placed in it in 1974, Philip Litner had a right to rely upon the integrity and faithfulness of his trustee. See Reynolds v. Sumner, 126 Ill. 58, 18 N.E. 334, 337 (1888). Until it was brought to the attention of the beneficiary, Philip Litner, that Central's fiduciary duty of trust had been breached, he could safely continue to rely on that duty without forfeiting his rights under the law. We know of no affirmative duty placed upon the beneficiary of a trust to actively investigate or oversee the conduct of his trustee.
 
 STANDARD OF CONDUCT
 
 50
 By statute, Illinois has outlined a so-called "Prudent Person Standard" against which the activities of trustees are generally measured.[9] Trustees are expected to exercise the judgment and care which persons of prudence, discretion and intelligence would exercise in the management of their own personal affairs and under the circumstances then prevailing. Based on the voluminous record in this case, it is clear to this court that the jury had ample evidence to hold that Central failed to properly discharge its fiduciary obligations during its tenure as Trustee of the Philip Litner Trust.
 
 
 51
 Trustees are held to a high standard of conduct and must exercise the highest degree of fidelity and the utmost good faith in the administration of the trust. The trustee's primary responsibility is to the beneficiary. Especially where their individual interests are concerned, trustees' actions are governed by rules which exact of them the utmost good faith, honesty, integrity, faithfulness and fair dealing. The interests of the beneficiary must at all times remain paramount to the personal interests of the trustee. See In Re Hartzell's Will, 43 Ill.App.2d 118, 192 N.E.2d 697, 706 (1963). See also Scott, Trustee's Duty of Loyalty, 49 Harv.L.Rev. 521 (1936).
 
 
 52
 The language of Central's trust agreement with Philip Litner provided that the Trustee would have discretionary powers which were to be exercised "in the best interests of the beneficiaries." Central maintains that this provision of the trust agreement dictates some lesser standard of conduct than that normally required of a trustee and that the district court committed error in instructing the jury to judge Central's conduct against the "Prudent Person Standard." To substantiate this proposition, Central cites this court's opinion in Childs v. National Bank of Austin, 658 F.2d 487 (7th Cir.1982). We disagree with the Trustee's position and fail to recognize how Childs in any way modifies or diminishes the fiduciary duty Central National Bank owed to Philip Litner.
 
 In Childs this court stated:
 
 53
 "Under Illinois law, discretionary decisions by trustees are not to be overturned in the absence of extenuating circumstances such as bad faith, fraud or an abuse of discretion."
 
 
 54
 Id. at 494. The court also noted that "unquestionably, trustees are obligated to act with the highest degree of fidelity and utmost good faith toward the beneficiaries." Id. Failure to exercise absolute fidelity to the interests of the beneficiary by the trustee constitutes an abuse of discretion.
 
 
 55
 It is clear that Central, as Trustee of the Litner Trust, did not discharge its fiduciary duties as prudent individuals would manage their own affairs. On the other hand, Central, where its own dollars were involved as commercial banker of Curtis, did exactly what an astute investor holding an unsecured note of Curtis would do to protect their individual interest faced with the corporation's dismal financial situation. That prudent and intelligent individual would collateralize the debt just as Central did with their own commercial loan. If subsequently that collateral appeared to be insufficient, the self-interested creditor would demand additional security. This is the course of conduct Central followed in order to safeguard its financial interests vis-a-vis Curtis Electro Corporation. After Central had protected its own interests securing its commercial loans with all of the available assets of Curtis, Central (as Trustee) finally turned its attention to the best interest of the cestui que trust.
 
 
 56
 In its dealings with Curtis it is clear that Central at all times subordinated the interest of Philip Litner, the beneficiary, to that of its own commercial banking division. By the time Central clearly and unequivocally demonstrated to Eli Fink (Philip Litner's legal counsel) the need to take action to protect the Trust's interests regarding the Curtis notes, the hour was too late for the bank as Trustee to, at last, attempt to properly protect the beneficiary. We agree with the jury and affirm their verdict that Central is liable to the Estate of Philip Litner for the damages proximately caused by its significant breach of his trust.
 
 DAMAGES
 
 57
 Central contends that Judge McGarr improperly instructed the jury regarding two aspects of the damage issue: (A) the burden of proving the amount of damages proximately caused by Central's breach of trust; and (B) the imposition of pre-judgment interest.
 
 A.
 
 58
 Central maintains that the trial court's jury instruction regarding the burden of proof of damages was erroneous and requires this court to reverse the judgment in favor of Jefferson National. The instruction complained of recited:
 
 
 59
 "Plaintiff has the burden of proof on the issues of damages except that Central National Bank has the burden of proving that any part of the loss would have been incurred even if there had been no breach of trust."
 
 
 60
 Relying on Elmhurst National Bank v. Glos, 99 Ill.App.2d 74, 241 N.E.2d 121, 124 (1968), Central correctly contends that it is "fundamental that the burden of proof rests upon the one who claims that a trustee had imprudently retained or invested trust funds, for a trustee is presumed to have acted in good faith and to have performed his duties under the trust." Additionally, Central argues that:
 
 
 61
 "Evidence which merely shows a decrease in value of the trust property, without showing that the trustee wrongfully caused the shrinkage, does not make a case."
 
 
 62
 G. Bogert & G. Bogert, The Law of Trusts and Trustees, Sec. 871 (2d ed. 1982).
 
 
 63
 We agree with Central that the burden of proof was on Jefferson National to show that Central wrongfully caused the loss to the Trust but find Central's objection to Judge McGarr's jury instruction to be without merit. The judge correctly instructed the jury as to the plaintiff's burden of proof and a review of the record establishes without doubt that Jefferson National has met that burden. There is more than substantial and overwhelming evidence in the record to support Jefferson National's allegations that Central's conflict of interest, manifesting itself in the Trustee's failure to secure the payment of the Trust's promissory note, while encumbering the assets of Curtis as its commercial lender, was a proximate cause of the financial loss suffered by Philip Litner due to the unenforceability of the promissory note. A "proximate cause" need not be the only cause or the last or nearest cause of a loss. I.P.I.2d Sec. 15.01 (1971).
 
 
 64
 The record clearly demonstrates that Central imprudently and improperly failed to perform its duties as Trustee of the Litner Trust. The wealth of such evidence easily overcomes any presumption that might have existed that Central had properly performed its duties while acting as the Trustee of the Philip Litner Trust. Central's actions in this case are replete with examples of the causal connection between Central's conflicting roles as Trustee and commercial lender and the unenforceability of the Curtis note. There is no doubt that at the time Curtis filed its bankruptcy petition the promissory note was virtually uncollectible.
 
 
 65
 We agree with the trial judge that once Jefferson National clearly demonstrated the breach of Central's duty and the resultant damage, the burden of proof switched to Central to prove in its defense that throughout the period of time involved the note was uncollectible or "worthless" through no fault of their own. The burden was on Central to prove that any attempt by the bank to collect or secure the Curtis' note during the time it was concurrently acting as Central's commercial lender would have been fruitless. See Estate of Stetson, 463 Pa. 64, 345 A.2d 679, 690 (1975). We need to look no further than the fact that Central itself in 1972 & 1973 obtained security interests in virtually all of Curtis' collateral to secure its commercial loans to find sufficient evidence to support the jury's implicit finding that the note was not uncollectible or unsecurable during the term of Central's trusteeship. In the absence of a sufficient quantum of proof in the record of the note's "actual value" during Central's trusteeship, we agree with the jury that the most equitable and satisfactory way of arriving at a just compensation for the note itself is that of the outstanding principal balance of the Curtis promissory note reduced by those monies that were received by Philip Litner's Estate in July of 1979 pursuant to Curtis' bankruptcy reorganization plan. See Snyder's Administrator's v. McComb's Executrix, 39 F. 292, 302 (3rd Cir.1889), affirmed, 149 U.S. 629, 13 S.Ct. 993, 37 L.Ed. 876 (1892).
 
 B.
 
 66
 In its verdict, the jury awarded $183,673.33 in interest calculated at the prime rate computed on a simple interest basis from the date of Curtis' bankruptcy filing through the month of trial. Central maintains that no pre-judgment interest could be awarded under the facts of this case because Illinois law generally provides for pre-judgment interest only when it is based on a contract between the parties or specified by statute. Alternatively, Central argues that if the pre-judgment interest awarded was actually "lost Trust income," the rate of return used in its calculation was erroneous.
 
 
 67
 Jefferson National contends that the jury's interest award was a proper calculation of the income lost by the Trust due to Central's breach of fiduciary duty and was particularly appropriate under the facts of this case since the Trust and Central were both engaged in making interest-bearing investments. The interest rate chart submitted to the jury was prepared by Jefferson National and included three rates to be used in measuring the lost Trust interest income: (1) the 7 1/2 percent interest rate set forth in the 1972 Curtis promissory note; (2) the prime rate; and (3) the rate of one-year U.S. Treasury Notes. Additionally, the rates were also calculated on both simple and compound interest bases. Jefferson National argues that the jury was justified in selecting the prime rate as the most true and accurate basis for its award as this rate adequately reflects the proper measure of lost Trust income in this conflict of interest case where the Trustee profited by preferring its own interest.
 
 
 68
 We agree with the plaintiff-appellee, Jefferson National, that lost Trust income was a proper element of damages in this case and that portion of the jury's award calculated on the basis of the prime rate in effect between 1974 and 1980 properly compensates the Estate of Philip Litner for lost Trust income opportunity caused by Central's breach of fiduciary duty, prevents Central from profiting from its breach of trust and is not an improper award of pre-judgment interest.
 
 
 69
 "Frequently, where the beneficiary pursues the remedy of a recovery of a money judgment against the Trustee, interest is added to the amount directed to be paid. Where the Trustee has deprived the beneficiary of the use of the Trust property or its proceeds or products, the value of that use may be estimated by charging interest. The sole object of allowing the beneficiary interest is to make him whole--to place him in the position he would have been in if the Trustee had performed his duty. When interest will be allowed, at what rate and from what date is wholly in the discretion of the court."
 
 
 70
 G. Bogert & G. Bogert, the Law of Trusts and Trustees, Sec. 863 (2d ed. 1982).
 
 
 71
 Central's breach of its fiduciary duty proximately caused the Estate of Philip Litner to be deprived of the outstanding balance of the Curtis Promissory Note and all income that would have accrued thereon from early 1974 through the time of trial. It was within the province of the jury to determine that the prime rate accurately reflected the amount of income received by Central on monies properly attributable to and improperly denied to Philip Litner's Estate during the period at issue. A trustee who commits a breach of trust and incurs liability for a certain amount of money and the loss of income thereon is properly accountable not only for the return of the money but also interest actually received by him during that period. Restatement (Second) of Trusts, Secs. 205 and 207 (1959). By its very definition, the prime rate is the interest rate at which a bank makes commercial loans and, therefore, was a proper award providing for full recovery of lost Trust income by the Estate of Philip Litner and preventing Central from profiting from its breach of trust. Accordingly, the judgment of the trial court is affirmed.
 
 IMPLIED WARRANTY OF AUTHORITY
 
 72
 Central alleged in its third-party complaint that if it was held liable to the Estate of Philip Litner, then Jerry Litner should be held liable to Central due to his implied warranty of authority to act as Philip Litner's agent. Following a jury verdict in favor of Jerry Litner on the third-party complaint, the district court granted Jerry Litner's motion for a directed verdict. On appeal, Central submits that that jury verdict in favor of Jerry Litner was against the overwhelming evidence adduced at trial and, therefore, the directed verdict in favor of Jerry Litner was clearly erroneous.
 
 
 73
 Central and Jerry Litner agree that an action for breach of an implied warranty of authority to act as an agent is cognizable under Illinois law. See Feinberg v. Great Atlantic and Pacific Tea Co., 131 Ill.App.2d 1087, 266 N.E.2d 401 (1970) and Moore v. Lewis, 51 Ill.App.2d 388, 9 Ill.Dec. 337, 366 N.E.2d 594 (1977). The Restatement (Second) of Agency Sec. 329 (1957) reads in pertinent part:
 
 
 74
 "A person who purports to make a ... representation on behalf of another who has full capacity but whom he has no power to bind, thereby becomes subject to liability to the other party thereto upon an implied warranty of authority, unless he has manifested that he does not make such warranty or the other party knows that the agent is not so authorized."
 
 Comment (a) to Sec. 329 provides:
 
 75
 "When an agent purports to make a ... representation for a principal, the other party thereto can reasonably assume from such conduct that the agent represents that he has power to bind the principal."
 
 
 76
 To this court, Central argues that "the evidence presented at trial ... was overwhelming that [Jerry Litner] impliedly warranted his authority as agent for Philip Litner, that Central reasonably relied thereon, and that a direct relationship existed between Jerry Litner's conduct and the alleged breaches of trust." Def.Br. p. 43. Central also cites this court to portions of the record which the bank maintains adequately demonstrate that Jerry Litner impliedly warranted to the Trustee that he was acting as an authorized agent of Philip Litner in discussions with the bank regarding the Litner Trust. Central asks this court to reverse the jury verdict and remand for a new trial on the issue of the liability of Jerry Litner.
 
 
 77
 We may set aside the verdict of the jury and the judgment of the court, and grant a new trial, only if we find the verdict wholly unwarranted and contrary to the manifest weight of the evidence. Zuckerman v. Berg Manufacturing and Sales Company, 279 F.2d 904, 905 (7th Cir.1960). The inquiry on appeal is whether the result reached by the jury is one which is reasonable on the facts and evidence, not whether other conclusions might also have been reached. Lynch v. Board of Ed. of Collinsville, 82 Ill.2d 415, 45 Ill.Dec. 96, 412 N.E.2d 447 (1980).
 
 
 78
 After a review of the record, we decline to hold that the judgment of the jury is unreasonable or against the manifest weight of the evidence. An appellate court's function is limited. It is the fact finders' function to hear and observe the witnesses and to weigh the conflicting evidence. On appeal, we are not to decide a case based on what we, as individual judges, would have decided under the same or similar circumstances. Rather, we must accept the findings of the jury unless those findings are clearly erroneous. See Washington v. Sherwin Real Estate, Inc., 694 F.2d 1081, 1090 (7th Cir.1982). Accordingly, under our appellate standard of review, the verdict in favor of Jerry Litner is affirmed.[10]
 
 CONCLUSION
 
 79
 Based on the foregoing, we hold that: (1) the instant case was properly tried to a jury; (2) the complaint of the Personal Representative was not time-barred; (3) the trial court correctly instructed the jury as to the standard of care required of the Trustee; (4) the Personal Representative is entitled to recover the face amount of the note and the appropriate interest thereon; and (5) the trial court did not erroneously enter judgment in favor of the third-party defendant. Accordingly, the decision of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Irving Hill, Senior District Judge of the Central District of California, is sitting by designation
 
 
 [1]
 Curtis Electro Corporation was engaged in the manufacture and sale of custom-made fluorescent lighting fixtures. The corporation operated as a holding company with several subsidiaries actually manufacturing and selling the fixtures. During 1968, Curtis subsidiaries were located in New York, Chicago, Dallas and Reading, Pennsylvania
 
 
 [2]
 Mr. Purcell had previously been introduced to Philip Litner by Michael Gaffigan, a Curtis director and Central vice president in charge of the Curtis commercial loan account
 
 
 [3]
 Testimony adduced at trial revealed that Central's intra-office correspondence referred to the Litner Trust as being subject to "courtesy consult." Pursuant to this designation, Philip Litner was to be consulted by the trust administrator, as a courtesy, prior to the Trustee taking any investment action
 
 
 [4]
 Jerry Litner is the third-party defendant-appellee in this action. Jerry became a member of the Curtis Board of Directors in 1968 and the following year was advanced to President and Chief Operating Officer of a newly established Curtis subsidiary while also remaining a vice president of the holding company
 
 
 [5]
 This was Mr. Duff's first notice of the fact that Curtis had granted Central's Commercial Lending Department numerous security interests to collateralize its commercial loans
 
 
 [6]
 Mr. Duff's letter to Jerry Litner recited:
 "[I]n view of the questionable competency of your father the process of appointing a Successor Trustee could understandably be a complex and lengthy process and may be particularly difficult for the family. Additionally, we have been pleased to serve the family over the past several years and would like to continue that service if the conflict of interest questions can be resolved."
 Mr. Duff formulated his opinion as to Philip Litner's mental condition during a visit to the Litner home during early May of 1974. This visit was Central's first direct contact with Philip since his stroke in 1971.
 
 
 [7]
 Prior to the revocation, at the request of Central, Philip Litner was examined by his personal physician to determine his mental competency. It was the opinion of Philip's physician, Dr. Richard Shafron, that Mr. Litner was "capable of making decisions involving simple and uncomplicated matters referrable [sic] to his business and personal affairs."
 
 
 [8]
 We accept without further comment Central's contention that all claims of Jefferson National arising prior to May 1, 1973 are barred by Illinois' five year statute of limitations. Ill.Rev.Stat. ch. 83, Sec. 16 (1977). Jefferson National contends that the ten year limitation period of Ill.Rev.Stat. ch. 83, Sec. 17 (1977), applies to the instant action as it is based upon a written trust agreement. No case has been cited to us nor does our research disclose a decision of an Illinois appellate court deciding this issue. In light of our determination regarding trustee repudiation and the accrual of a claim by Philip Litner, it is unnecessary for us to determine the applicable statute of limitations
 
 
 [9]
 "In acquiring, investing, reinvesting, exchanging, retaining, selling and managing property for any trust heretofore or hereafter created, the trustee thereof shall exercise the judgment and care under the circumstances then prevailing, which persons of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital."
 Ill.Rev.Stat. ch. 17, Sec. 1675 (1981).
 
 
 [10]
 The issues addressed above are dispositive of this case. We find the additional arguments raised by the appellant before this court concerning the district court's jury instructions regarding the law of agency and comparative negligence, the judge's supplemental instruction to the jury during deliberations and the admission of expert testimony to be without merit