**In re CONSUPAK, INC., Debtor.**

**Bankruptcy No. 77 B 7186.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

June 3, 1988.

Edward Limperis, Hinsdale, Ill., Trustee.

Gerald F. Munitz, Winston & Strawn, Chicago, Ill., for Continental Illinois Bank and Trust Co. of Chicago.

Dean C. Harvalis, Office of the U.S. Trustee, Chicago, Ill., for U.S. Trustee.

Irving H. Levy, Chicago, Ill., for National Acceptance Co.

Martha A. Mills, Foss, Schuman, Drake & Bernard, Chicago, Ill., for Schoeman, Marsh, Updike & Welt.

Philip V. Martino, Rudnick & Wolfe, Chicago, Ill., for Edward Limperis.

Joseph L. Matz, Holleb & Coff, Chicago, Ill., for trustee.

Karen H. Kennedy, Arvey, Hodes, Costello & Burman, Chicago, Ill., for debtor; Kleinberg, Moroney, Masterson & Schachter, Millburn, N.J., co-counsel.

Daniel M. Pelliccioni, Katten, Muchin & Zavis, Chicago, Ill., for National Acceptance Co. of America.

Schenck, Price, Smith & Kings, Morristown, N.J., for Philip A. Anderson, Richard R. Askew, Evan Howell and William A. Seubert.

## MEMORANDUM AND OPINION AS TO TRUSTEE'S PARTIAL OMISSION TO INVEST ESTATE FUNDS

JACK B. SCHMETTERER,
Bankruptcy Judge.

This matter is before the Court on application of various counsel and the Trustee for fees, and on the Court's own motion to consider whether Trustee Edward Limperis (the "Trustee") should be surcharged for mismanaging part of the funds of this estate. As described below, substantial sums of money have been held in a noninterest-bearing checking account throughout the course of this case. The Court has accordingly held a hearing, received and considered affidavits and evidence, and reviewed Trustee's various reports and briefs from various counsel. There were several issues: (1) whether Trustee had a duty to invest the estate's idle funds; (2) whether the Trustee breached such duty; and (3) if such duty existed and was breached, whether Trustee should be surcharged for the interest lost by reason of such breach. In addition to affidavits, evidence heard, and reports filed by the Trustee, the Court has considered memoranda and argument of counsel regarding *inter alia* whether they had a duty to counsel the Trustee with regard to the investment of the estate's funds.

All facts set forth below come from such reports, evidence, briefs, and from the record of proceedings in this Bankruptcy case.

### FACTUAL BACKGROUND

On October 11, 1977 Consupak, Inc. ("Debtor") filed a petition for reorganization under the Bankruptcy Act (the "Act").

11 U.S.C. § 1 *et seq.* (1976).[1] The proceeding was subsequently converted to a liquidation on January 18, 1979. Edward Limperis was appointed Trustee and qualified by filing bond on February 8, 1979. Limperis is an experienced trustee, and has handled an estimated 1,200 to 1,500 cases, with estimated total assets of $25–30 million since his first appointment in 1961. Limperis is not an attorney. However, the Court gave him leave to employ Joseph Matz as attorney for the Trustee (the "Trustee's Attorney").

The Trustee skillfully liquidated most of the Debtor's assets in early 1979. Sale proceeds, together with collection of amounts owing the Debtor, brought cash of over $2,500,000 into the estate. The greater portion of this cash was initially invested in certificates of deposit ("CD's") which totalled over $1,600,000 at the end of 1979. The balance of the estate's noninterest-bearing checking account was then $74,014.14. Thus, at the end of 1979, over 95% of the estate's cash was invested at interest. (*See* Exhibit A, which details cash inflow and outflow for each month from February of 1979 through September of 1986. Exhibit A also presents monthly balances for the estate's checking account and certificates of deposit.)

After 1979, almost all cash inflow consisted of interest income from the estate's investments in CD's. Most expenditures of the estate during the period 1981–83 were made pursuant to three large distribution orders. The business was of course closed down. Thus, cash outflow was irregular and tended to be concentrated in the months following a distribution order. After May of 1983, however, expenditures out of the estate were minimal. Receipts and expenditures, by year, were as follows:

| | Receipts | Expenditures |
|---|---|---|
| 1980 | $277,191 | $ 52,266 |
| 1981 | 258,381 | 452,797 |
| 1982 | 198,526 | 202,231 |
| 1983 | 78,344 | 623,008[2] |
| 1984 | 82,920 | 12,863 |
| 1985 | 63,003 | 13,886 |
| Jan.–Sept. 1986 | 41,634 | 912 |
| TOTAL | $999,999 | $1,357,963 |

In order to meet the estate's cash needs from 1980 to 1983, the Trustee reduced the estate's investment in certificates of deposit by $800,000. Proceeds were then transferred to the noninterest-bearing checking account. From January 1, 1980 to May 31, 1983 the checking account balance increased from $95,299.49 to $320,548.19. After May, 1983, the checking account balance continued to grow while the amount invested in CD's remained constant. All CD's were liquidated on September 29, 1986. The average end-of-month balances for the checking account and certificates of deposit during this period are as follows: [3]

| | Noninterest-bearing Checking Account | Certificates of Deposit |
|---|---|---|
| 1980 | $204,605 | $1,600,000 |
| 1981 | 231,667 | 1,575,000 |
| 1982 | 333,423 | 1,475,000 |
| 1983 | 334,667 | 866,667 |
| 1984 | 390,468 | 800,000 |
| 1985 | 443,688 | 800,000 |
| Jan.–Sept., 1986 | 583,003 | 711,111 |

This breakdown is significant to the Court's discussion of breach of duty, *infra.*

1. Hereafter all references to the Bankruptcy Act are to the Act as amended to August 1, 1976.

Although the Act was repealed by the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549 (codified as amended at 11 U.S.C. § 101 et seq. (1987)), the Act remains applicable to cases in which the original petition was filed prior to October 1, 1979. *See* Pub.L. No. 95–598, title IV, § 402(a), 92 Stat. 2682 (1978).

2. Receipts and expenditures in 1983 for the months before and after May 31, 1983 are further detailed as follows:

| | Receipts | Expenditures |
|---|---|---|
| Jan.–May, 1983 | $25,125 | $605,355 |
| June–Dec., 1983 | 53,219 | 17,653 |
| TOTAL | $78,344 | $623,008 |

3. Data on account balances was obtained from copies of monthly statements for Account 2–2444–4 at Manufacturers Bank. Copies of those statements are included in Part 3 of Report of Edward Limperis, Trustee, Pursuant to Order of Court Entered May 21, 1987.

The noninterest-bearing account balances were computed by averaging the ending balances reported on the monthly statements for each period in question.

The balance invested in certificates of deposit was determined by tracing transfers to and from the checking account, which were reported as debit and credit memos on the monthly statements. Monthly figures thus determined were then averaged for each period in question.

Of $1.3 MMM held by the Trustee after September 29, 1986, no funds at all were invested.

As is obvious from the above, investments at interest decreased, while the non-interest-bearing checking account grew during the foregoing seven-year period. The Trustee's accumulation of idle funds continued to grow after May, 1983, even though expenditures beyond that date were insignificant in amount and no major cash demands were anticipated until the Final Account was filed.

This situation, as well as the fact that *no* part of the substantial estate funds was invested at interest after September 29, 1986, was learned through Court inquiry during a status hearing on May 21, 1987. After breathing appropriate fire in response to that news, this Court ordered that Trustee immediately invest the estate's funds at interest that very day. In addition, the Trustee was ordered to prepare a report describing his investments of the estate's cash over the entire period of his trusteeship, and the reasons for disinvestment after September 29, 1986. A hearing on that report was set for June 18, 1987.

As a supplement to the aforementioned report on his investments, the Trustee filed affidavits stating that it was the prevalent practice of bankruptcy trustees in this district to remove funds from interest at the time of filing the Final Report. According to Trustee and his affiants (who were experienced bankruptcy counsel in this District), trustees often removed funds from interest for the following reasons: (1) to make funds available for immediate distribution at the Final Meeting; (2) to avoid a second dividend based on earnings after the Final Report; and (3) to avoid the additional administrative expenses and tax returns associated with continued investments at interest. Both affiants also stated that the Office of the Clerk of the Bankruptcy Court encouraged the practice of disinvestment, so as to expedite the closing of cases and the preparation of the Closing Department's proposed Distribution Order.

At the hearing held June 18, 1987, Trustee's counsel basically reiterated the statements of the Trustee's affiants and argued that this District's local bankruptcy rules [4] did not impose on the Trustee any duty to invest idle funds of the estate. This Court then deferred its determination regarding any possible sanction based on the circumstances presented until after notice and further hearing.

Pursuant to general requirements of law, this Act case was removed and reviewed by the District Court, then remanded to this Court to complete work here. A hearing was then noticed for March 31, 1988, with instructions to the parties that they should be prepared to address the following issues: (1) whether the Trustee had a duty to invest; (2) whether the Trustee breached such duty; and (3) if such duty existed and was breached, whether the Trustee should be surcharged for the interest lost by reason of such breach.

The Trustee and Wayne Nelson, Clerk of the Bankruptcy Court for the Northern District of Illinois (the "Clerk"), each testified at the March 31, 1988 hearing. The following summarizes those portions of their testimony relating to the Trustee's duty to invest funds of the estate.

The Trustee testified that, in removing funds from interest after the filing of the Final Report, he followed the established custom in this district of himself and most other trustees. The Trustee totally ignored the applicable Local Bankruptcy Rule. Indeed he professed unawareness of our local Rule regarding investment, stated that he did not seek counsel's advice regarding the advisability of investing idle funds, and was not given such advice by his counsel.

In response to questioning as to why balances of several hundred thousand dollars were not invested at interest in the years preceding the filing of the Final Report, the Trustee stated his belief that those funds would be needed to cover un-

---

**4.** *See,* the discussion of this district's local Bankruptcy Rule 4.10 in the section on the scope of the Trustee's duty to invest, *infra.*

specified imminent expenses. The Trustee stated that the decision to leave those sums uninvested was an exercise of his best judgment, but offered no specific explanation or definition of anticipated cash needs that might support such judgment.

In support of the argument that Trustee had acted prudently, Trustee's personal counsel also introduced into evidence a 1984 report prepared by the United States General Accounting Office ("GAO").[5] That report criticized the fact that many bankruptcy trustees surveyed in that study did not invest proceeds received from the liquidation of estate assets. Counsel for Trustee contrasted the situation described in the GAO report with the fact that the Trustee in this case had invested sizeable sums of money in certificates of deposit. Thus, counsel offered the report to disprove any negligent conduct by the Trustee. In short, he argued that the Trustee could not be surcharged unless he was negligent, and could not be held negligent when he invested more than most trustees did nationally. As a "standard" against which this Court should measure possible negligence of Trustee, he thereby offered a report describing an improper national practice of non-investment and argued that he performed better in this case.

At the March 31st hearing, the Clerk of this Court also testified. In his long experience with the Closing Department of our Court, there was an informal practice of requesting trustees to disinvest at the time of their filing the Final Report. The purpose was to enable final computation of amounts to be distributed. He said that was the practice until May 21, 1987, when this Court found large funds of this estate uninvested, and expressed shock at that fact. Not all trustees complied with the requests of our Clerk's office to disinvest. The Clerk further testified that the average time to close a case was approximately

two months. Nonetheless, some cases required more time to close, especially where the case was exceptionally large. The Clerk could not recall, however, whether there was any common procedure relating to the re-investment of funds in cases where closing was delayed.

At the March 31, 1988 hearing, the Court ordered the Trustee's counsel to brief the three issues before the Court. In addition, Trustee's counsel was ordered to prepare briefs on whether he had a duty to counsel the Trustee or to seek Court direction regarding investment of uninvested estate funds.

This Court concludes for reasons set forth below that the Trustee at all times had a duty to seek Court permission to invest all funds in excess of a reasonable reserve to meet immediate expenses and unpaid dividends due to be paid to creditors, and a duty to do so in precise obedience to our Local Bankruptcy Rule. In the interim between June 1, 1983 and the filing of the Filing Report on September 29, 1986, the Trustee breached that duty by leaving several hundreds of thousands of dollars in a noninterest-bearing account from time to time. The Trustee was entitled to rely both on the wording of the Local Bankruptcy Rule (which required investment except during the 90–day period prior to distribution of assets) and the advice of the Clerk's Office (which normally closed its cases during the same 90–day period after the Final Report was filed). However, once this unusually large and complex case was not closed after the 90 days had passed, he was under a duty to reinvest or obtain court order to excuse himself from doing so if there was any good reason not to do so. By failing to reinvest or seek court leave to withhold estate funds from investment more than 90 days after the filing of the Final Report, the Trustee further breached

5. Report to the Attorney General and the Director, Administrative Office of the U.S. Courts; Greater Oversight and Guidance of Bankruptcy Process Needed, U.S. General Accounting Office, August 21, 1984. In this report, the GAO reviewed the activities of bankruptcy trustees in order to determine whether the purpose of the Bankruptcy Reform Act of 1978 was being

achieved. As part of its investigation, the GAO studied 771 asset cases closed in a six-month period in seven judicial districts. The results indicated that in 502 of 662 cases, there had been no interest earned on estate funds. The GAO was especially critical of the Department of Justice's failure to provide trustees with guidelines regarding investment.

his duty. Trustee's duty to invest was a corollary of Trustee's duty to maximize the estate for the benefit of creditors. His breaches of that duty over the years were both deliberate and negligent.

Trustee's Attorney also had a fiduciary duty to the estate and its creditors. Trustee's Attorney was aware of the Trustee's disinvestment after the Final Report and he had a duty to counsel the Trustee regarding the duty to invest. Counsel has argued the same "practice" of disinvestment as did the Trustee. However, he had a fiduciary duty to inquire into the status of investment and to counsel Trustee to invest except during the 90 days after Final Report was filed, unless otherwise excused or directed by the Court. Breach of that duty by such counsel lessens the value of his services for which compensation may be awarded.

This opinion addresses, in turn, the duty of the Trustee and the attorney for the Trustee. While the authority discussed here applies to this Act case, the result would be even clearer in a case filed under the Bankruptcy Code (fn. 9 at 541 *infra* ).

## I. TRUSTEE'S DUTY TO INVEST

### A. *Scope of the Duty to Invest*

Bankruptcy Rule 605(b), in effect at the time this case was filed, imposes on a trustee under the Act the following duty with respect to funds of the bankruptcy estate:

> The trustee shall deposit all money received by him in a designated depository, either in a checking account or, *if authorized by the court,* in an interest-bearing account or deposit.

Bankruptcy Rule 605(b) (emphasis added).

Act § 47 a(2), enacted in 1963, had similarly required prior court approval for the deposit of funds in interest-bearing accounts.[6] The Congressional purpose was to enable and encourage Bankruptcy Courts to authorize and order investment at interest.[7]

Although Rule 605(b) did not expressly require that a trustee apply to the court for permission to invest estate funds, the Bankruptcy Court of the Northern District of Illinois adopted on March 17, 1975 a Rule which imposed on trustees in all cases a duty to make that application. Bankruptcy Rule 4.10 for the Northern District of Illinois (hereafter "Local Rule 4.10") provided as follows:

RULE 4.10. Deposit of Funds

A. *Funds to be Deposited in Separate Accounts Except for Funds in Chapter XIII Cases.*

All funds received by receivers and trustees shall immediately be deposited in authorized depositories in separate accounts which shall be designated "Estate of _____ (name of bankrupt) _____ by _____ (name)

---

**6.** Section 47 a(2) provided that trustees shall "deposit all money received by them in designated depositories initially in demand deposits; and subsequently, if authorized by the court, in interest-bearing savings deposits, time certificates of deposit, or time-deposits open account."

**7.** Senate Report No. 147 on H.R. 2849, 88th Cong., 1st Sess. (1963) set forth the purpose of § 47 a(2):

> Section 47 a(2) of the Bankruptcy Act requires a trustee in bankruptcy to deposit all money received by him in "designated depositories." Section 61 of the Act provides that the courts of bankruptcy "shall designate, by order, banking institutions as depositories for the money of estate \* \* \*."
>
> As a result of two early cases these provisions have been interpreted to require the trustee to deposit the money of a bankrupt's estate in demand deposit accounts. By this view he may not make deposits in interest-bearing accounts unless the creditors consent. *See Huttig Mfg. v. Edwards,* 160 Fed. 619 (8th Cir.1908) and *In re Dayton Coal & Iron Co.,* 239 Fed. 737 (E.D.Tenn.1916).
>
> It has been brought to the attention of the committee that in cases where a substantial period of time elapses before the closing of the estate, large sums of money may be held by the trustee for long periods of time without the realization of any interest on those funds.
>
> *The committee believes that sound fiscal management requires that the funds of a bankrupt's estate shall not lie idle for long periods of time but should earn interest under proper safeguards.* To this end, the bill provides that the court may authorize the trustee to deposit the money of a bankrupt's estate in interest-bearing accounts in "designated depositories." The security of such deposits is assured by section 61 of the Bankruptcy Act. (Emphasis added.)

_____, Receiver (or Trustee)," provided however, that funds received by Chapter XIII trustees may be commingled in a single bank account under an account name which clearly identifies the funds as being part of a consolidated trusteeship account. In such cases, a separate detailed ledger shall be maintained for each individual debtor by the trustee.

B. *Limitations on Deposits in Interest–Bearing Accounts.*

Receivers and trustees shall not deposit any monies coming into the estate in interest-bearing savings deposits, time certificates of deposit, or time deposits-open account *unless such deposit is authorized by the referee upon application.* Said application shall set forth at least the following:

(1) The monies in the receiver's or trustee's hands and the name of the depository;

(2) Whether all expenses heretofore authorized to be disbursed have been disbursed and, if not, the reason therefor;

(3) Whether any dividends have been declared and paid as provided in Rule 308 of the Bankruptcy Act and, if not, the reasons for not requesting declaration and payment of dividends;

(4) The amount of funds of the estate which, after payments of debts entitled to priority, expenses of administration (other than allowances of fees for receivers, trustees and attorneys), and payment of declared dividends to creditors ought to be deposited as authorized by Rule 605(b) of the Bankruptcy Rules.

(5) The estimated period of time which may elapse before the estate will be closed or any such funds disbursed; and,

(6) Any other facts or circumstances relevant to determining if the authority requested would benefit the estate.

C. *Duty to Make Application Under Rule 4.10B.*

*It shall be the duty of each receiver or trustee to make an application under Rule 4.10B whenever not less than fifty dollars ($50.00) in interest could be earned by the deposit in a regular pass-book account of such funds in his possession which are in excess of the total needed to pay any immediate expenses and any declared but unpaid dividends to creditors; receiver or trustee need not file such application if the amount of said excess funds is less than $500 or the time remaining before the declaration of a dividend is less than ninety (90) days.* (Emphasis added.)

Accordingly, under Local Rule 4.10C a trustee has an affirmative duty to seek court approval to invest estate funds. A trustee is relieved of that duty only in three instances: (1) Where the estate has on hand less than $500 of funds in excess of the amount needed to pay immediate expenses and declared but unpaid dividends; (2) where a dividend would be declared in less than 90 days, or (3) where investment of the funds would yield less than fifty dollars in interest. Absent one of these three circumstances, a trustee who failed to apply for permission to invest estate funds would violate the duty imposed by local rule.

The Trustee concedes that Local Rule 4.10C applies to this case. Nonetheless, the Trustee never applied to the court for permission to invest estate funds. As evidence of his compliance with the local Rule, the Trustee points to the fact that in fact he invested funds. According to Trustee, the duty to invest or seek court permission to invest existed in this case only until the filing of his Final Report. Trustee argues that Local Rule 4.10C had no effect after that Final Report was filed by him.

■ Because the Trustee made no application to the Court at any time for leave to invest funds of the estate, he was in violation of Local Rule 4.10C throughout the case. However, because no question has been raised about the safety, prudence, or rate of return of those investments that he made, such investments to the extent made fulfilled Trustee's duty under the Rule. Because substantial sums remained uninvested both before and after the Final Report was filed, two questions are raised: (1) whether at all times, the Trustee had a duty to petition the court regarding the

amount to be invested, and (2) whether that duty continued during all or part of the period that followed filing of the Final Report.

As described below, the Court answers both these questions in the affirmative. As part of Trustee's duty to make the estate productive for the benefit of creditors, the Trustee was under a duty under local Rule 4.10 in the light of Bankruptcy Rule 605(b) and § 47(a)(2) of the Act to petition the Bankruptcy Court regarding the amount to be invested. In the absence of such petition which was never filed, that duty could only be fulfilled by prudently investing all funds in excess of a reasonable reserve to meet immediate expenses and "declared but unpaid" dividends to creditors. That duty did not terminate upon the filing of the Final Report, except to the extent excused by Local Rule—that is, the 90-day non-investment period.

It has been long held that a trustee in bankruptcy stands in a fiduciary relationship to creditors of the estate. *See, e.g., In re Allen B. Wrisley Co.,* 133 F. 388, 390 (7th Cir.1904), *cert. denied sub nom. Central Commercial Co. v. Chicago Title and Trust Co.,* 197 U.S. 622, 25 S.Ct. 798, 49 L.Ed. 910 (1905). As a fiduciary, a trustee's duties include that of maximizing the distribution from the estate to creditors. *United States v. Aldrich (In re Rigden),* 795 F.2d 727, 730 (9th Cir.1986). In carrying out these responsibilities, a trustee is to be an active agent for the prosecution of the interests of all creditors of the estate. *Imperial Assur. Co. v. Livingston,* 49 F.2d 745, 748 (8th Cir.1931). As an officer of the court, a bankruptcy trustee must keep the court advised of his actions as trustee and seek court approval in important matters. *Id.*

In addition, the Act requires that a trustee perform specific functions, such as that of depositing estate funds in designated depositories upon court approval of applications to do so. The fact that the Act specifies the performance of certain functions does not, however, mean that compliance with those obligations specified by statute constitutes fulfillment of a trustee's duties. *United States ex rel. Willoughby v. Howard,* 302 U.S. 445, 451–452, 58 S.Ct. 309, 313, 82 L.Ed. 352 (1938). The Act's enumeration of a trustee's duties is not the sole source of his rights and responsibilities. *Commercial Credit Corporation v. Skutt,* 341 F.2d 177, 181 (8th Cir.1965). In addition, the common law requires that a trustee exercise care and prudence in the matters left to his discretion. *Willoughby v. Howard,* 302 U.S. at 451–452, 58 S.Ct. at 313. Thus, in determining the full scope of a trustee's duty to invest, the common law applies even where no local Rule defines that duty.

At least one Bankruptcy court has applied state common law in determining the scope of a fiduciary's duty to invest funds of a bankruptcy estate. *Judge v. Pincus, Verlin, Hahn & Reich, P.C. (In re J & J Record Distributing Corporation),* 80 B.R. 53, 16 B.C.D. 1026 (Bankr.E.D.Pa. 1987). That court found, under the state law of trusts, that attorneys for a debtor-in-possession occupied a fiduciary position with respect to creditors of the estate. *Id.* 80 B.R. at 55. Those attorneys accordingly had a common law duty to make productive certain funds of the estate within their possession. *Id.* Thus, the attorneys were liable for their failure to invest the estate's funds, even though the Bankruptcy Code did not explicitly mandate such investment. *Id.* at 56. An analysis of Illinois law leads to a similar conclusion in this case. Illinois courts have long held that a trustee must act with the same degree of skill and diligence which an ordinarily prudent man would exercise in his own similar private affairs. *Christy v. Christy,* 225 Ill. 547, 553, 80 N.E.2d 242, 243 (1907). In the context of any specific transaction, a trustee should act with the degree of reasonable diligence which men of common prudence employ in like business affairs. *Corrington v. Corrington,* 124 Ill. 363, 368, 16 N.E. 252, 253 (1888). This duty of care has been incorporated into the Illinois Trust and Trustees Act. Ill.Ann.Stat., ch. 17, ¶ 1651 *et seq.* (Smith Hurd 1987). Section 5 of the Trusts and Trustees Act sets forth the following standard:

In acquiring, investing, reinvesting, exchanging, retaining, selling and managing property for any trust heretofore or hereafter created, the trustee thereof shall exercise the judgment and care under the circumstances then prevailing, which persons of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent dispositions of their funds, considering probable income as well as the probable safety of their capital.

Ill.Ann.Stat., ch. 17, ¶ 1675 (Smith Hurd 1987). Thus, in assessing whether a trustee has a duty to invest trust funds, the relevant inquiry under Illinois law is whether a person of ordinary prudence would do the same in managing his own private or business affairs.

Illinois authority for more than a century has found that a trustee charged with the payment of money to beneficiaries should not allow funds in his hands to remain unproductive. *Mathewson v. Davis*, 191 Ill. 391, 398, 61 N.E. 68, 70 (1901); *Hough v. Harvey*, 71 Ill. 72, 77 (1873). A trustee must invest funds held in trust even where there are no expressed or implied directions to do so in the instrument creating the trust. *Sholty v. Sholty*, 140 Ill. 81, 87, 29 N.E. 1041, 1043 (1892).

Courts of other jurisdictions have also found that the duty to make trust property productive is a corollary of a trustee's duty of prudent investment. *See, e.g., Hegner v. Van Rossum (Matter of Estate of Kugler)*, 117 Wis.2d 314, 344 N.W.2d 160, 164 (1984). The Second Restatement of Trusts enunciates this duty as follows:

The trustee is under a duty to use reasonable care to make the trust property productive. Restatement (Second) of Trusts § 181 (1959).

. . . . .

[i]n the case of money, it is normally the duty of the trustee to invest it so that it will produce an income. The trustee is liable if he fails to invest trust funds which it is his duty to invest for a period which is under all the circumstances unreasonably long. If, however, the delay is not unreasonable, he is not liable.

If the trustee commits a breach of trust in neglecting within a reasonable time to invest the money, he is chargeable with the amount of income which normally would accrue from proper trust investments.

*Id.*, comment c. Accordingly, where a delay in distributing trust funds occurs, a trustee who allows those funds to accumulate without investment breaches his fiduciary duty to beneficiaries. *Manchester Band of Pomo Indians, Inc. v. United States*, 363 F.Supp. 1238, 1245 (N.D.Cal. 1973). Simple business prudence dictates that such idle funds should instead be placed at interest. *Id.* at 1245–1246.

 Creditors holding allowed claims against a bankruptcy estate have vested rights in the funds held by the trustee and income therefrom. Where delays in distribution ensue, the common law application in Illinois and elsewhere therefore requires that a trustee invest the funds held for ultimate distribution. The Bankruptcy Act limits trustees' power to invest through its requirement of court approval. However Bankruptcy Rule 605(b), as supplemented by this District's Local Rule 4.10C, imposes on a bankruptcy trustee a duty to petition the court for permission to invest idle funds of the estate so as to fulfill the common law duty to invest prudently.

 The duty to invest (or at least seek court direction with respect thereto) does not terminate upon the filing of the trustee's Final Report. At that point, the estate is only entering into a winding-up stage, which basically encompasses a period to prepare for the final distribution of the estate's property. As our experienced Bankruptcy Court Clerk testified, that period normally takes only 60 to 90 days following filing of the Report. Thus, Local Rule 4.10 excused investment during a period of 90 days before distribution. However there was no excuse under the Rule for not re-investing once that 90 days had run. A trustee is not discharged upon the filing of the Final Report. There is no

discharge until after the final meeting and court approval of the trustee's accounts. *Levy v. Schorr*, 266 F. 207, 208 (3d Cir. 1920). Until the estate is closed,[8] creditors may object to the trustee's management of the estate and the trustee may be surcharged. *In re Schwartz*, 4 F.2d 895, 896 (2d Cir.1925).

 Under the common law of trusts, a trustee also continues to serve until the trust is terminated through distribution of the *res* to beneficiaries. Restatement (Second) of Trusts § 344, comment a (1959). During this winding up period, the trustee is charged with duties appropriate to that phase of administration. *Id.*

The Second Restatement of Trusts describes a trustee's responsibilities with respect to investments during the winding up period:

> When the time for the termination of the trust has arrived, the power of the trustee to make investments ordinarily ceases. Where, however, the process of winding up the trust cannot be immediately accomplished, it may be reasonable for the trustee to make short-term investments in order to keep the trust property productive.

*Id.*, comment h. See also 4 Scott, *The Law of Trusts*, § 344 at 2736 (3d ed. 1967).

 Thus, when this estate did not wind up in the usual 60 days, Trustee had a duty either to reinvest the large estate funds during the winding up of the estate or at least to apply to this Court for instructions to invest or not invest. That duty could not terminate until the Clerk's office had noticed the Final Meeting in the case. Given the Act's requirement of prior court approval to invest, a trustee would ordinarily satisfy his duty during this period by making an application to the court. Since Local Rule 4.10C only speaks of an

exception of trustee's duty during 90 days prior to distribution of dividend, like trustee's other duties with respect to trust property, the duty to invest or at least seek court direction continues until the trustee is discharged except for that 90–day period.

 The Bankruptcy Act should always be construed in a way to carry out its purposes and to care for the situations created by it. *Imperial Assur. Co. v. Livingston*, 49 F.2d 745, 750 (8th Cir.1931). As an officer of the court, a trustee is entrusted with the property of the estate until the final distribution to creditors. Until he actually turns over the property, an officer of the court may not turn his back on his duties with respect to that property. *Id.*

In this case, therefore, the Trustee had a fiduciary duty to invest funds in excess of the amount reasonably needed to meet immediate expenses and anticipated dividends to creditors except for the 90 day period usually sufficient for the Clerk to ready a case for final meeting. That duty, which is part of the Trustee's overall obligation to maximize the estate under both Bankruptcy law and the common law, could have been discharged through compliance with Local Rule 4.10C. However, the Trustee did not even seek court direction. Because the fiduciary duties of Trustee continued during the winding up of the estate, his duty to invest or seek court direction not to invest did not terminate upon the filing of his Final Report.[9]

### B. *Breach of the Duty to Invest*

 A "breach of trust" is a violation by the trustee of any duty which, as trustee, he owes to the beneficiary. Restatement (Second) of Trusts § 201 (1959). That term "is sufficiently comprehensive to include every violation by a trustee of a duty

---

**8.** Act § 2 a(8) empowers the court of bankruptcy to "[c]lose estates, by approving the final accounts and discharging the trustees...."

**9.** A trustee's duty to invest estate funds in cases filed under the current Bankruptcy Code is governed by § 345(a) of the Bankruptcy Code. 11 U.S.C. § 345(a) (1987). This Court notes its agreement with the Eastern District of Pennsylvania's interpretation of § 345(a) in *Judge v.*

*Pincus, Verlin, Hahn & Reich, P.C. (In re J & J Record Distributing Corp.)*, 80 B.R. 53 (E.D.Pa. 1987), which finds that a trustee of funds in cases under the Bankruptcy Code (in that case a law firm holding funds) have a duty to invest estate funds even in absence of a Local Rule requiring investment. Notably, § 345(a) does not require a prior application to the court.

which equity lays upon him, whether willful and fraudulent, or done through negligence, or arising through mere oversight or forgetfulness." *Chicago Title and Trust Co. v. Chief Wash Co.*, 368 Ill. 146, 155, 13 N.E.2d 153, 157 (1938); *Stuart v. Continental Illinois National Bank and Trust Company of Chicago*, 68 Ill.2d 502, 523, 369 N.E.2d 1262, 1272, 12 Ill.Dec. 248, 258 (1977), *cert. denied*, 444 U.S. 844, 100 S.Ct. 86, 62 L.Ed.2d 56 (1979).

 Ordinary negligence is the standard for assessing whether a breach of duty by a bankruptcy trustee is actionable. *Hall v. Perry (In re Cochise Park, Inc.)*, 703 F.2d 1339, 1357 (9th Cir.1983). Any failure to exercise diligence in carrying out his duty is sufficient to charge the trustee with negligence. *Zuttermeister v. Chicago Title and Trust Co. (In re Kuhn Bros.)*, 234 F. 277, 280 (7th Cir.1916), *cert. denied*, 242 U.S. 629, 37 S.Ct. 14, 61 L.Ed. 536 (1916); *see e.g., Woodmar Realty Company v. McLean*, 294 F.2d 785, 793 (7th Cir. 1961), *cert. denied*, 369 U.S. 803, 82 S.Ct. 643, 7 L.Ed.2d 550 (1962).

In assessing whether a trustee has been negligent, bankruptcy cases look to whether the trustee has acted with the diligence or skill "of an ordinarily prudent man in the conduct of his private affairs under similar circumstances and with a similar object in view." *Johnson v. Clark (In re Johnson)*, 518 F.2d 246, 251 (10th Cir.1975), *cert. denied sub nom. Clark v. Johnson*, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975).

 The Trustee here testified that he never learned of Local Rule 4.10, and was never told by his counsel of his duties thereunder. Nor did he ever inquire of any counsel, in this case or in any other case, as to his duty in that regard. He cites no authority for the position that a trustee's ignorance of duty is a defense to an inquiry into his breach of that duty, nor will this Court condone such a view. A trustee may not close his eyes to duty and say that he did not see. He is not free to perform his work in ignorance of duties and then raise a defense of "empty head but pure heart". Ignorance of the law is no defense to a trustee found to have breached his duty under the law.

The Trustee maintains that throughout this case he exercised diligence with respect to investments by the estate. However, that clearly is not so. Both before and after the filing of the Final Report, the Trustee breached his duty to invest the estate's funds until this Court learned of the problem through court inquiry. Because the issues involved for these two periods differ, each period will be addressed separately.

(1) *Period before filing the Final Report*

The Trustee maintains that, until two months after the filing of his Final Report, he "always invested the vast majority" of the estate. Memorandum of Edward Limperis at 67. Calling his decisions regarding the level of investment at interest as an exercise of his business judgment, the Trustee would have the Court accept his own conclusion that he acted reasonably. In addition, the Trustee cites the severely criticized non-investment practices of many trustees described in the 1984 GAO report[10] as evidence of his own compliance with low standards generally followed by bankruptcy trustees who often do not invest estate assets.

Neither argument has merit. First, the Trustee's own allegations are insufficient to support a finding that he acted reasonably, and are contradicted by his reports as to the levels and timing of uninvested moneys and need for payments from time to time. Second, the GAO report of deficient performance by bankruptcy trustees throughout the United States does not establish the standard of care against which the Trustee's actions should be judged.

 Fiduciaries breach their duty to invest where funds held in trust accumulate beyond the amount needed to meet current estate claims and administrative expenses. *See, e.g., Hegner v. Van Rossum (Matter of Estate of Kugler)*, 117

---

**10.** *See,* footnote 5, *supra.*

Wis.2d 314, 344 N.W.2d 160, 164 (1984). Simple business prudence dictates that accumulated funds be invested pending distribution. *Lynch v. John M. Redfield Foundation*, 9 Cal.App.3d 293, 88 Cal.Rptr. 86, 90 (2d Dist.1970). The fact that a portion of the estate has been invested may not relieve the fiduciary of liability if substantial sums remain needlessly idle. *See e.g., Simenowitz v. Nashman (Matter of Estate of Simenowitz)*, 36 A.D.2d 760, 319 N.Y.S. 2d 575 (N.Y.App.Div.1971). Nor is good faith a defense in an action against trustees based on negligence. *Lynch*, 88 Cal. Rptr. at 91.

Thus, in assessing the propriety of the Trustee's investment decisions during the ongoing administration of this estate, the Court must look to whether funds retained in the noninterest-bearing demand account exceeded cash needs of the estate at that time. The fact that the Trustee invested a portion of the estate in CD's does not insulate his actions from scrutiny as to the uninvested portion.

 The estate's bank statements reported in Trustee's supplemental reports, as well as the Trustee's Final Report and Account, clearly indicated that Trustee imprudently maintained an obviously unreasonable and unnecessary level of idle funds. This is particularly true of the period of relative inactivity after June 1, 1983.[11]

Until the middle of 1983, the Trustee was engaged in a creditable effort to liquidate the estate's assets, and to satisfy the claims of secured creditors and priority claimants by interim distributions. These payments were pursuant to court orders disposing of specific claims or as part of three larger distributions. The third distribution, which was ordered paid on March 29, 1983, apparently satisfied most remaining administrative, wage and tax claims. In addition, the third distribution provided for a 10% dividend to unsecured creditors. Thus, at the time of third distribution, it was clear that there would be an additional dividend to unsecured creditors. As stated previously, the Trustee clearly had a duty to maximize that dividend.

Claims from the third distribution were paid out of the checking account in March through May, 1983. As of May 31, 1983, the ending balance in that account was $320,548.19. Assuming, as the Trustee alleges, that checks of approximately $60,000 remained outstanding, funds on deposit exceeded known liabilities by approximately $260,000. Thus, a portion of this amount could have been invested. There were, however, no further transfers of funds to certificates of deposit. Instead, the uninvested balance in the checking account continued to grow, supplemented by an inflow of $217,693. All of that income represented interest earned on the estate's CD's. None was reinvested. In total, in the three-year period from June 1, 1983 to June 30, 1986,[12] the estate paid out only $44,443, leaving a net inflow of $183,250. That amount, added to the balance of $320,548 as of May 31, 1983, caused the balance of uninvested funds to grow to $503,798.

During this period, the Trustee obviously could have managed the estate's case more efficiently and invested more of the funds on hand. No sizeable further payments were expected until after the Final Meeting would be held, and that could not occur until after the Final Report was filed. Since the Trustee's Final Report would initiate this winding up process, he was in a position to coordinate the maturity dates of investments with projected outflows of cash. Even if there was some uncertainty as to when claims and professional fees would be paid, investment in a federally insured money market account would have been completely liquid.

11. Giving the Trustee the benefit of any doubt, this opinion will discuss breach of Trustee's duty in the period after June 1, 1983 during which the estate was inactive. Even when the estate was active before June, 1983, however, there may have been unreasonable accumula-tions in the estate's demand account at different times. *See* Exhibit A.

12. The Court uses June 30, 1986 as a measuring date, since that was the date of the last bank statement preceding the filing of the Final Report.

Trustee thereby allowed several hundreds of thousands of dollars to accumulate without interest over a three-year period, an omission that was wholly unnecessary and careless. In so doing, the Trustee lost a valuable opportunity to increase the amount ultimately distributable to unsecured creditors. By his testimony, that was a deliberate omission. That omission constituted a willful as well as negligent breach of the Trustee's duty to invest that portion of the estate's funds.

### (2) *Breach of duty after filing the Final Report*

At the time that Trustee filed his Final Report, the estate owned certificates of deposit totalling $800,000 in amount. Those certificates matured on September 29, 1986. As the amount of unmatured interest on those instruments was known, a final distribution could be calculated based on the Final Report. Accordingly, the Trustee included interest through September 29, 1986 in his Final Report. Upon maturity, however, the Trustee did not reinvest the proceeds received. Instead $800,000 was transferred to the noninterest-bearing checking account, bringing that account to over $1,300,000.

Trustee's testimony at the March 31, 1988 hearing indicates that the decision to disinvest was partly motivated by the desire to avoid the expense of a supplemental distribution of earnings. According to the Trustee, continued investment would also have entailed additional administrative expenses for preparation of tax returns. Thus, his decision was assertedly based, in part, on a desire to economize.

■ The decision to disinvest was not reasonable or prudent. It is true that the Trustee was faced with uncertainty as to when the estate would close. But such uncertainty in this case posed no difficulties in assessing whether continued investment could yield a net return to the estate. The amount of money held in a checking account at this time was $1,316,010. Investment would have produced a large return. Employment of an accountant to file a supplemental tax return and employment of a paralegal to calculate a supplemental

dividend would have been small by comparison. At any event, Trustee never calculated or offered evidence that such additional costs would have been more than a small part of the interest that was lost here. Moreover, Trustee never sought directions from the Court, nor advice of his counsel, in making his decision not to reinvest.

The Trustee also maintains that at all times he believed that closing was imminent. Based on his then 25 years of experience, the Trustee says he expected the estate to close within about two or three months, as was usual in a typical small case in the district. The Trustee apparently did not believe that a case of this size would be delayed in closing. In this assessment of the time needed for closing, the Trustee's testimony would appear to be contradicted by that of the Clerk of this Court. The Clerk testified from his experience that long delays were experienced in larger cases. Unfortunately, the delay in this case was substantial, as the Trustee well knew. Some delay resulted from discovery of a filing error related to the Debtor's 1979 Debtor–In–Possession Report, and the subsequent need to settle claims of creditors who had never received proper notice. In addition, both the Trustee's Attorney and the Debtor's Attorney sought extensions of time to file or to amend their fee petitions. The Trustee had notice of those extensions. In other words, the case could not be wound up quickly by the Clerk because of omissions outside the Clerk's office which Trustee knew of.

■ Besides asserting that the decision to invest was a well-intentioned exercise of his judgment, the Trustee defends that decision on the basis of "custom" in this District. As described in the introductory portion of this opinion, the Trustee has advanced testimony and affidavits to the effect that it was the prevalent practice in this district to disinvest after filing the Final Report. The thrust of this argument is that, because he acted in conformity with the custom of local trustees, the Trustee satisfied the standard of care expected of fiduciaries. This Court cannot accept that

proposition, except to the very limited extent supported by the Local Rule.

■ In any legal action based on negligence, custom in the community does not establish the standard of care against which a person's conduct is to be judged. *See e.g., Darling v. Charleston Community Memorial Hospital,* 33 Ill.2d 326, 331, 211 N.E.2d 253, 257 (1965) *cert. denied sub nom. Charleston Community Hospital v. Darling,* 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966); *Harris v. Union Stock Yard and Transit Company of Chicago,* 29 Ill.App.3d 1072, 1082, 331 N.E.2d 182, 189 (1st Dist.1975). While custom is admissible as evidence of the appropriate standard of care, it is not conclusive. *Darling,* 211 N.E.2d at 257. Duty in a negligence case is always the same obligation to conform to the legal standard of reasonable conduct. *Id.*

■ As described above, a trustee must conform to the legal standard of a prudent person making investment decisions regarding his own money. Even where the administration of an estate is to be of short duration, a prudent person would generally not contemplate depositing surplus funds in a noninterest-bearing account. *In re Frey's Estate,* 55 Misc.2d 567, 285 N.Y.S.2d 364, 366 (Surr.Ct.1967). The duty to invest will arise where the estate will remain open for a sufficient period of time to make investment practical. *See, e.g., Estate of Kugler,* 344 N.W.2d at 164. If, after deduction of related expenses, continued investment would yield a net benefit to the estate, a trustee should keep funds invested after the filing of the Final Report.

The Trustee and his affiants allege that upon filing their Final Reports local trustees in Chicago routinely took funds out of interest. The Clerk confirmed that his office requested such disinvestment as an aid to his office in computing final distribution.

The Local Rule excused investment during the normal 90–day period necessary for the Clerk to prepare for Final Meeting. But there was no evidence that the Clerk asked Trustees in this District to violate the Local Rule after 90 days passed without Final Meeting being set in the larger bankruptcy cases. The evidence also showed that some trustees maintained moneys under investment at all times. If there was a "practice" to disinvest large sums even after the 90 days passed, that was a gross disregard by trustees of their obligations and the Local Rule. Widespread adherence to this type of shoddy practice would not convert that practice into a standard of care for trustees. Hence, the Court adamantly rejects the defense and disregard of Local Rule based on "custom".

■ The practice is well established by which trustees should seek instructions from the court, given upon notice to creditors and interested parties, as to matters which involve difficult questions of judgment. *Mosser v. Darrow,* 341 U.S. 267, 274, 71 S.Ct. 680, 683, 95 L.Ed. 927 (1951). This is the most effective means by which the trustee can be protected from personal liability for breaches of duties as trustee. *Id.* Trustees should also consult the court when they are in doubt as to the scope of their duty to invest. *Witmer v. Blair,* 588 S.W.2d 222, 224 (Mo.Ct.App.1979) (*quoting* Restatement (Second) of *Torts* § 201), comment b (1959). Ignorance of a trustee's duties is, indeed, no defense.[13]

Finally, it is clear that Local Rule 4.10C actually imposed the obligation to seek court direction regarding investments. Had the Trustee sought the advice of counsel, perhaps counsel might have alerted him to that fact (though Trustee's Attorney maintains that he, too, was unaware of the Local Rule!). On the record before the Court, there is only an obvious dereliction of duty. Hence, the Court finds that, both before and after the filing of the Final

---

**13.** *"Mistake of law as to existence of duties and powers.* A trustee commits a breach of trust not only where he violates a duty in bad faith, or intentionally although in good faith, or negligently, but also where he violates a duty because of a mistake as to the extent of his duties and powers ... In such case he is not protected from liability merely because he acts in good faith, nor is he protected because he relies on the advice of counsel."
Restatement (Second) of Trusts § 201, comment b (1959).

Report, the Trustee breached his duty to invest funds of the estate, except during the ninety days following the filing of his Final Report.

## C. *Surcharge*

■ "There is no question that a trustee in bankruptcy may be held personally liable for breach of his fiduciary duties." *In re Gorski*, 766 F.2d 723, 727 (2d Cir. 1985); *Red Carpet Corporation of Panama City Beach v. Miller (In re Red Carpet Corporation of Panama Beach)*, 708 F.2d 1576, 1578 (11th Cir.1983). This liability encompasses not only intentional, but also negligent violations of the duties imposed on the trustee by law. *Hall v. Perry (In re Cochise Park, Inc.)*, 703 F.2d 1339, 1357 (9th Cir.1983).

This Court is not bound by the approach of the Tenth and Sixth Circuits, which concluded that a bankruptcy trustee may only be held personally liable for damages arising from intentional—as opposed to negligent—conduct. *See, Sherr v. Winkler*, 552 F.2d 1367, 1375 (10th Cir.1977); *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 461–462 (6th Cir.1982). Although one Seventh Circuit decision has cited the *Sherr* intentional standard with approval, *In re Chicago Pacific Corp.*, 773 F.2d 909, 915 (7th Cir.1985), its decision noted that the personal liability of the reorganization trustee was not at issue in that case. Hence, this Court understands this Circuit to use a negligence standard, as in the *In re Kuhn* decision, 234 F. 277 (7th Cir.1916), *cert. denied*, 242 U.S. 629, 37 S.Ct. 14, 61 L.Ed. 536 (1916). However, since the Trustee's disinvestment decisions in this case were wholly deliberate both before and after the filing of his Final Report, he was in both willful and negligent violation of his duty.

For such violations of duty the Trustee may be surcharged with the cost of his omissions:

A bankruptcy trustee's duties and responsibilities are as heavy as those of other trustees, including executors and administrators ... [i]f in the performance of these duties he violates the law or acts so negligently or carelessly as to

inflict loss upon estate or persons interested therein, he may answer in damages, according to the principles applicable in like situations to any other trustee or fiduciary.

*In re B.A. Montgomery & Son*, 17 F.2d 404, 405–406 (N.D.Ohio 1927).

For many years, courts have surcharged bankruptcy trustees for negligent breaches of their fiduciary duties. *See, e.g., In re Kuhn*, 234 F. 277, 281 (7th Cir.1916) *cert. denied*, 242 U.S. 629, 37 S.Ct. 14, 61 L.Ed. 536 (1916); *Carson, Pirie, Scott & Co. v. Turner*, 61 F.2d 693, 694 (6th Cir.1932).

■ Lost interest is the proper measure of damages for a trustee's failure to invest trust funds. *Strow v. Shanahan (In re Estate of O'Donnell)*, 8 Ill.App.2d 348, 352, 132 N.E.2d 74, 77 (1st Dist.1956). In determining the amount of surcharge, a court should attempt to place the beneficiary in the position the beneficiary would have occupied if the trustee had not breached his duty. *Jefferson National Bank of Miami Beach v. Central National Bank in Chicago*, 700 F.2d 1143, 1154 (7th Cir. 1983). Thus, the surcharge compensates for the trust's lost income opportunity. *Id.* Bankruptcy cases have similarly charged trustees in the amount of lost income opportunities. *See, e.g., In re Imperial "400" National, Inc.*, 456 F.2d 926, 931 (3d Cir.1972); *Matter of Combined Metals Reduction Co.*, 557 F.2d 179, 197 (9th Cir. 1977).

■ "Whether interest will be allowed, at what rate and from what date is wholly in the discretion of the court." *Jefferson National Bank*, 700 F.2d at 1154 (quoting G. Bogert & G. Bogert, *The Law of Trusts and Trustees*, § 863 (2d ed. 1982)). In exercising its discretion to determine a surcharge,

... factors to be considered include, but are not limited to, the following: the administrator's knowledge, background and experience; the secure investment options available during the time the administrator managed the estate funds, and the interest rates available from those investments at that time; and the

amount of available liquidated estate funds in excess of funds needed to pay current estate claims and administration expenses, or to meet other foreseeable contingencies.

*Matter of Estate of Kugler*, 344 N.W.2d at 167. Interest will not be compounded against the trustee, however, except in cases of gross delinquency. *Conant v. Lansden*, 409 Ill. 149, 159, 98 N.E.2d 773, 778 (1951).

Applying those principles here, the Court first notes that the Trustee skillfully liquidated assets of the estate and then invested a considerable portion of estate funds throughout much of this case. However, as stated previously, the Trustee violated his duty both before and after the filing of the Final Report. Because different principles should apply to the surcharge for each of those periods, they will be considered separately.

### (1) *Period before filing the Final Report*

■ Act § 47 a(2) limits permissible investments by a bankruptcy trustee to "interest-bearing savings deposits, time certificates of deposit, and time deposits—open account." 11 U.S.C. § 75 a(2). Although the Trustee actually chose CD's for his other investments during the period, the penalty for early withdrawal provided a disincentive for investing in CD's. In view of this fact, as well as Local Rule 4.10C's reference to passbook investments, the Trustee could have invested excess funds in a passbook or fully liquid and federally insured money market account. Either could have been liquidated quickly to meet the estate's cash needs. Hence, surcharge will be computed at 5.5%, which has been the approximate prevailing passbook rate at major Chicago banks from 1983 through 1987.

During the pre-Final Report period, the Trustee invested in CD's having a maturity of three months. As the interest earned was deposited into the demand account, that balance increased every three months. Accordingly, the following calculation computes interest for three-month periods.

Rather than compounding interest, the calculation employs the actual balance of the account as of the beginning of each computation period.

■ Lost interest should only be computed on excess funds not needed for immediate expenses. As earlier noted, as of May 31, 1983, the estate had outstanding checks of about $60,000. In addition, expenses over the three-year period between June 1, 1983 and June 30, 1986 totalled $44,443. There was a need to have sufficient funds on hand to cover outstanding checks and some small occasional cash flow needs. It appears clear that a retention of $80,000 dollars without investment would have been sufficient to meet those needs.

Interest lost for the period preceding the filing of the Final Report is computed as follows:

| Period Beginning | Beginning Account Balance, per Exhibit A | Beginning Balance less $80,000 | Lost Interest (Simple Interest at 5.5% for 3 months) |
|---|---|---|---|
| 6-1-83 | 320,548 | 240,548 | $ 3,308 |
| 9-1-83 | 320,819 | 240,819 | 3,311 |
| 12-1-83 | 338,673 | 258,673 | 3,557 |
| 3-1-84 | 356,114 | 276,114 | 3,797 |
| 6-1-84 | 374,339 | 294,339 | 4,047 |
| 9-1-84 | 394,528 | 314,528 | 4,325 |
| 12-1-84 | 406,543 | 326,543 | 4,490 |
| 3-1-85 | 415,305 | 335,305 | 4,610 |
| 6-1-85 | 431,119 | 351,119 | 4,828 |
| 9-1-85 | 447,986 | 367,986 | 5,060 |
| 12-1-85 | 460,122 | 380,122 | 5,227 |
| 3-1-86 | 475,288 | 395,288 | 5,435 |
| 6-1-86 | 489,998 | 409,998 | 5,637 |
| TOTAL LOST INTEREST | | | $57,632 |

### (2) *Period after filing the Final Report*

The last of the Trustee's CD investments matured on September 29, 1986. At that time all funds were transferred to the demand account, increasing the balance to $1,316,010. Those funds remained uninvested until May 21, 1987, at which point the Trustee placed them in a money market account upon this Court's express direction. Using the passbook rate of 5.5%, interest of approximately $46,474 could have been earned on $1,316,010 in the period between September 30, 1986 and May 21, 1987. Eliminating the 90 days contemplated by Local Rule he still was responsible for failure to invest over $1,300,000 for three months and three weeks. The interest thereby lost amounted to $22,619.

**548**

### (3) *Computation of Surcharge*

The Trustee argues that there should be no surcharge for the latter period, as the events which delayed closing the estate were beyond his control, if not without his knowledge. In addition, the uncontroverted testimony in this case suggests that the Clerk's office then encouraged trustees to disinvest upon filing the Final Report. Moreover, the Trustee was not an attorney. Trustee's counsel never told him of his obligations under the Local Rules, and indeed says he did not himself know of it. Apart from the omission to invest, the Trustee has generally fulfilled his duties with credit and with the result that large funds are available for distribution to general unsecured creditors.

■■■■ The surcharge of lost interest is governed by equitable considerations. *Matter of Estate of Lindberg,* 49 Ill.App.3d 154, 157, 364 N.E.2d 555, 557, 7 Ill.Dec. 394, 396 (2d Dist.1977). A court has the discretion to decrease the amount of surcharge where parties other than the fiduciary have contributed to the delay in closing an estate. Given all the circumstances set forth above, and in consideration of the recommendations by the U.S. Trustee whose representative appeared as *amicus* at this Court's invitation, a reduction in the surcharge for lost interest is appropriate. Trustee's efforts brought a large estate into existence for the benefit of creditors. His omission should not wholly deprive him of compensation for that valuable service.

Of the $80,251 in interest lost to this estate by reason of Trustee's omissions, only one-third or $26,750 will be surcharged against him by reducing his fee in that amount.

## II. DUTY OF TRUSTEE'S ATTORNEY TO ADVISE TRUSTEE REGARDING INVESTMENT OF ESTATE'S FUNDS

■■■■ All parties seeking compensation from a bankruptcy estate may be held to fiduciary standards. *Finn v. Childs Co.,* 181 F.2d 431, 441 (2d Cir.1950). Those performing duties in the administration of a bankrupt estate are not acting as private individuals, but as officers of the court. *York International Building, Inc. v. Chaney (Matter of York International Building, Inc.),* 527 F.2d 1061, 1068 (9th Cir. 1975). As such, they are expected to render loyal and disinterested service in the interest of those for whom they purport to act. *Id.* at 1069.

■■■■ Among the fiduciaries of a bankruptcy estate are the various attorneys who may be compensated from the estate. *E.g., In re Coastal Equities, Inc.,* 39 B.R. 304, 309 (Bankr.S.D.Cal.1984) (attorney for debtor-in-possession); *Pension Benefit Guaranty Corporation v. Pincus, Verlin, Hahn, Reich & Goldstein Professional Corp.,* 42 B.R. 960, 963 (E.D.Pa.1984) (attorney for creditors' committee). Similarly, the fiduciary duties of counsel for a bankruptcy trustee have been held to be "equivalent" to those of the trustee. *In re Imperial "400" National, Inc.,* 456 F.2d 926, 929 (3d Cir.1972).

■■■■ This does not mean that counsel for a trustee is to undertake the administrative responsibilities of the trustee. An attorney may only be compensated as an attorney for services requiring legal expertise.[14] *In re Mabson Lumber Co.,* 394 F.2d 23, 24 (2d Cir.1968); *Matter of Sumthin' Special, Inc.,* 2 B.R. 743, 749 (N.D.Ill.1980). Where counsel does not so limit his services, this Court would accordingly deny him professional compensation. *In re Wildman,* 72 B.R. 700, 706 (Bankr.N.D.Ill.1987). Thus, while both a trustee and his attorney are fiduciaries, they do not perform the same functions in a bankruptcy case.

In this case, Trustee's Attorney stresses the distinction between the functions of a

---

14. Bankruptcy Rule 219(c)(3), applicable to cases under the Act, provides that:

"[c]ompensation may be allowed an attorney or an accountant *only* for professional services" (emphasis added).

bankruptcy trustee and his attorney. He correctly asserts that a trustee has primary responsibility for administering the estate and may seek legal advice when necessary. On the other hand, Trustee's Attorney would limit his own role to rendering legal advice upon request. Under this interpretation of duty, unless a trustee takes the initiative to seek his attorney's advice, the attorney would have no duty to counsel the trustee. As applied to his own case, Trustee's Attorney argues that he had no duty to render unsolicited advice regarding the investment of funds.[15]

 Trustee's Attorney misstates his duty. Besides serving as agent of a bankruptcy trustee, counsel for a trustee is a fiduciary of the estate. As a result, the attorney's contractual obligation to respond to requests from his client for legal advice is only part of his broader fiduciary duty to the estate. The fact that counsel fulfilled the obligation to advise his client upon request does not establish satisfactory performance of his overall fiduciary duty.

The Court also takes issue with assertion by Trustee's Attorney that "[c]ounsel for trustee was under no obligation to counsel [Trustee] to act in any manner inconsistent with the practice followed by other trustees and by the Bankruptcy Court Clerk's office in this district." Memorandum of Counsel for Trustee at 9. As earlier discussed, the existence of custom does not establish the standard of care by which trustee's actions should be judged. Certainly, counsel should never advise trustees to act with disregard for their duties to the estate regardless of what others do or don't do.

 In evaluating the performance of a trustee's attorney, then, it is necessary to determine the extent of duty to advise a trustee. The lower bounds of that duty are obvious: any attorney must, at a minimum, respond to client requests for legal advice. Because a trustee's attorney also has duties to the estate and to the court, however, the duty to advise requires a more active concern for the interests of the estate and of its beneficiaries, the unsecured creditors.

 A trustee's attorney cannot close his eyes to matters having legal consequences for the estate. Especially where legally adverse facts come to his attention, the attorney for a trustee must take the initiative to inform his client of the need for preventative or corrective action. In the case of uninvested funds, this means that the attorney must remind the trustee of the latter's duty to invest or seek court direction. At a minimum, the attorney should advise the trustee to consider whether investment at interest would yield a net benefit to the estate. In this case, the attorney was obliged to know of the Local Rule and to counsel the Trustee to obey it.

The principles underlying this conclusion are not set forth in bankruptcy statutes or rules. Rather, they are derived from ethical norms governing the practice of law. In particular, the Court looks to the American Bar Association Model Code of Professional Responsibility (the "ABA Code") and the American Bar Association Model Rules of Professional Conduct (the "Model Rules").

 "As the profession's own expression of its ethical standards, the [ABA] Code of Professional Responsibility, Ethical Considerations, and Disciplinary Rules provide substantial guidance to federal courts in evaluating the conduct of attorneys ap-

---

**15.** In support of this contention, Trustee's Attorney cites a May 19, 1980 memorandum opinion by Bankruptcy Judge James in this case on the subject of trustee's and attorney's fees. That opinion denied certain items of compensation to Trustee's Attorney for services (in negotiating disputes not in litigation) that Judge James felt should have been performed by the Trustee. But that opinion did not even discuss the scope of duty of Trustee's counsel to advise Trustee. Hence, the earlier opinion was simply not relevant to this discussion.

pearing before them." *Brennan's, Inc. v. Brennan's Restaurants, Inc.,* 590 F.2d 168, 172 n. 5 (5th Cir.1979). "The ABA Code has long been the established norm for guiding ethical conduct in the federal courts of this district." *Ransburg Corp. v. Champion Spark Plug Co.,* 648 F.Supp. 1040, 1041 (N.D.Ill.1986); *Lies v. General Electric Co.,* 659 F.Supp. 979, 981 n. 1 (N.D.Ill.1987) (noting the incorporation of the ABA Code into N.D.Ill. Local Rule 3.54(b)). Besides the ABA Code, a federal court may consider the Model Rules in evaluating the professional conduct of attorneys appearing before them. *See, e.g., Jones v. City of Chicago,* 610 F.Supp. 350, 355 (N.D.Ill.1984).

Those portions of the ABA Code dealing with the duty to advise clients fall under Canon 7, which states that: "[a] lawyer should represent a client zealously within the bounds of the law." Model Code of Professional Responsibility Canon 7 (1981).[16] At a minimum, Disciplinary Rule 7–101(A)(1) provides that: "[a] lawyer shall not intentionally [f]ail to seek the lawful objectives of his client through reasonable means permitted by the law …" Model Code of Professional Responsibility DR 7–101(A)(1) (1981).

Ideally, an attorney will take the role of active advisor, as set forth in Ethical Consideration 7–8:

A lawyer should exert his best efforts to insure that decisions of his client are made only after the client has been informed of relevant considerations. A lawyer ought to initiate this decision-making process if the client does not do so. Advice of a lawyer to his client need not be confined to purely legal considerations. A lawyer should advise his client of the possible effect of each legal alternative. A lawyer should bring to bear upon this decision-making process the fullness of his experience as well as his objective viewpoint. In assisting his client to reach a proper decision, it is often desirable for a lawyer to point out those factors which may lead to a decision that is morally just as well as legally permissible …

Model Code of Professional Responsibility EC 7–8 (1981).

The Model Rules reiterate the proposition that an attorney is to facilitate informed decision-making by his client. This obligation stems from the attorney's role as advisor and is part of the continuing obligation to communicate with clients.[17] Although lacking authority of the Model

---

**16.** The ABA Code is subdivided into nine Canons, which express "in general terms the standards of professional conduct expected of lawyers in their relationship with the public, with the legal system, and with the legal profession." Model Code of Professional Responsibility, Preliminary Statement (1981). The concepts expressed in each Canon are, in turn, developed in a number of related Ethical Considerations and Disciplinary Rules. Ethical Considerations "represent the objectives toward which every member of the profession should strive." *Id.* In contrast, Disciplinary Rules "state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." *Id.*

**17.** *Rule 2.1 Advisor.* In representing a client, a lawyer shall exercise independent professional judgment and render candid advice. In rendering advice, a lawyer may refer not only to the law but to other considerations such as moral, economic, social and political factors, that may be relevant to the client's situation.
Model Rules of Professional Conduct Rule 2.1 (1983).
*Rule 1.4 Communication.*
(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.
*Id.* Rule 1.4 (1983).

Rules themselves,[18] comment 5 to Rule 2.1 specifically addresses the circumstances in which an attorney should take initiative in offering advice to a client:

> In general, a lawyer is not expected to give advice until asked by the client. However, when a lawyer knows that a client proposes a course of action that is likely to result in substantial adverse legal consequences to a client, duty to a client under Rule 1.4 may require that the lawyer act if the client's course of action is related to the representation. A lawyer ordinarily has no duty to initiate investigation of a client's affairs or to give advice that the client has indicated is unwanted, but a lawyer may initiate advice to a client when doing so appears to be in the client's interest.

Model Rules of Professional Conduct Rule 2.1, comment 5 (1983).

■ The foregoing suggests that an attorney should, on his own initiative, offer legal advice in two circumstances: (1) when the client is unaware of the potentially adverse legal consequences of a proposed course of action, and (2) where the offering of advice would be in the client's best interests. In so doing the attorney would further Canon 7's objective of zealous client representation. Nowhere in the above-cited standards is there any suggestion that a responsible attorney is a passive observer who can remain silent in the face of a client's legally unacceptable decisions.

■ These principles are applicable here because Trustee's Attorney was aware that the Trustee had removed funds from interest after September 29, 1986.[19] Both reasons for offering advice were present. First, the Trustee was allegedly unaware of his duty to invest and the potentially adverse legal consequences of disinvestment. Second, it was certainly in the estate's best interests to maximize the estate through investment. Thus, because Trustee's Attorney knew of the Trustee's disinvestment after the Final Report was filed, he was under an ethical obligation to advise his client of the duty to re-invest or at least seek Court direction.[20] And he certainly was under an obligation to know of the Local Rule that he now disclaims awareness of.

■ Violation of an ethical obligation lessens the value of an attorney's services to his client. *In re Devers*, 33 B.R. 793, 798–799 (D.D.C.1983), *app. dismissed without op.*, 729 F.2d 863 (D.C.Cir. 1984). An omission to duty may result in denial or reduction of attorney's fees. *In*

---

**18.** The Model Rules are intended to provide a framework for the ethical practice of law. As such, the Rules have the dual purpose of establishing minimum standards of professional conduct and providing guidance in those situations not covered by the Rules. Thus, those Rules cast in imperative terms define proper conduct for purposes of professional discipline. Other Rules are permissive and define areas in which the lawyer has professional discretion. While the test of the Rules is authoritative, the Comments are intended as guides to interpretation of the Rules to which they relate. The Comments do not add obligations to the Rules. *Id.*, Statement of Scope.

**19.** Trustee's Attorney states that he knew funds had been invested before the filing of the Final Report. There is no evidence that he was aware that a substantial portion of the estate's funds remained uninvested during that period. Given the lack of a general duty to initiate legal advice, as well as the fact that a trustee's attorney is not to perform administrative tasks, the breach of the Trustee's Attorney's duty to advise his client took place after, rather than before, the filing of the Final Report.

**20.** It is pertinent to note that Trustee's Attorney had served as attorney to the creditor's committee before Debtor's adjudication as a bankrupt. By virtue of that representation, Trustee's Attorney should have acquired additional familiarity with creditors' interests. Although the designation of his position changed after the adjudication of bankruptcy, Trustee's Attorney ultimately continued to serve the interests of creditors.

The duty of loyalty to a client does not end when an attorney's representation of a client ends. *In re Corn Derivatives Antitrust Litigation*, 748 F.2d 157, 161 (3d Cir.1984), *cert. denied sub nom. Cochrane and Bresnahan v. Plaintiff Class Representatives*, 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985). A client has an expectation that the attorney will not abandon the client's position until the matter is completely resolved. *Id.* This duty of loyalty is part of an attorney's general duty to maintain public confidence in the integrity of the bar. *Id.*

*re Red Carpet Corp.*, 708 F.2d at 1578.[21] Accordingly, the Court will order an appropriate reduction in the fees to be paid Trustee's Attorney. In this case, the reduction will consist of one-half of the lost interest for the period after the Final Report was filed (one-half of $22,619) or $11,309.50.

## CONCLUSION

The Trustee in this case apparently did a creditable job in liquidating assets of the estate and in selecting investments for large portions of the estate assets. He failed in his obligation to come into bankruptcy court to seek permission to invest or not invest; failed to invest large sums that should have been invested before and (except for a 90–day period) after he filed his Final Report; and failed to stay alert to his duties of prudent re-investment after the initial 90–day period. The Trustee's counsel likewise failed to advise his client to invest after the Final Report was filed, and thereby did not fulfill his obligations. Each will bear part of the loss thereby incurred, through reduction in their fees awarded here.

Persons responsible for moneys to be distributed in a bankruptcy proceeding have a very real obligation to deal with funds with the same prudence they would exercise if the money belonged to them. Disregard of that duty to the harm of creditors cannot be allowed to pass without redress for that harm.

AMENDED EXHIBIT A

IN RE CONSUPAK, INC.
ANALYSIS OF CHECKING ACCOUNT 2–2444–4
MANUFACTURERS BANK

| Period Ended | Cash Receipts | Cash Disbursements | (Increase) Decrease in Investment | Account Balance EOM* | LaSalle Nat'l. Bank Checking** | Total Investment in CDs |
|---|---|---|---|---|---|---|
| 2–28–79 | 20,256.83 | 7,258.12 | | 12,998.71 | | |
| 3–30–79 | 30,697.52 | 24,828.92 | | 18,867.31 | 18,607.86 | |
| 4–30–79 | 88,950.20 | 90,098.37 | | 17,719.14 | 18,607.86 | |
| 5–31–79 | 892,400.84 | 285,182.16 | | 624,937.82 | 18,607.86 | |
| 6–30–79 | 101,886.19 | 59,620.85 | (600,000.00) | 67,203.16 | | 600,000.00 |
| 7–31–79 | 30,594.06 | 290,481.11 | 200,000.00 | 7,316.11 | | 400,000.00 |
| 8–31–79 | 1,130,710.84 | 743.25 | | 1,137,283.70 | | 400,000.00 |
| 9–30–79 | 165,158.23 | 44.26 | (1,100,000.00) | 202,397.67 | | 1,500,000.00 |
| 10–31–79 | 20,308.56 | 72,260.28 | (100,000.00) | 50,445.95 | | 1,600,000.00 |
| 11–30–79 | 48,383.33 | 2,206.50 | | 96,622.78 | | 1,600,000.00 |
| 12–31–79 | 13,950.00 | 36,558.64 | | 74,014.14 | | 1,600,000.00 |
| 1–31–80 | 27,483.34 | 6,197.99 | | 95,299.49 | | 1,600,000.00 |
| 2–29–80 | 13,536.66 | 6,477.43 | | 102,358.72 | | 1,600,000.00 |
| 3–31–80 | 12,373.33 | 396.00 | | 114,336.05 | | 1,600,000.00 |
| 4–30–80 | 27,964.99 | | | 142,301.04 | | 1,600,000.00 |
| 5–30–80 | | | | 142,301.04 | | 1,600,000.00 |
| 6–30–80 | | | | 142,301.04 | | 1,600,000.00 |
| 7–31–80 | 164,655.10 | 33,734.13 | | 273,222.01 | | 1,600,000.00 |
| 8–30–80 | | | | 273,222.01 | | 1,600,000.00 |
| 9–30–80 | | | | 273,222.01 | | 1,600,000.00 |
| 10–31–80 | 31,177.78 | 5,500.00 | | 298,899.79 | | 1,600,000.00 |
| 11–28–80 | | | | 298,899.79 | | 1,600,000.00 |
| 12–31–80 | | | | 298,899.79 | | 1,600,000.00 |
| 1–30–81 | 51,077.78 | 18,000.00 | | 331,977.57 | | 1,600,000.00 |
| 2–27–81 | | 40.00 | | 331,937.57 | | 1,600,000.00 |
| 3–31–81 | | 396.00 | | 331,541.57 | | 1,600,000.00 |
| 4–30–81 | 66,000.00 | | | 397,541.57 | | 1,600,000.00 |
| 5–29–81 | | | | 397,541.57 | | 1,600,000.00 |
| 6–30–81 | | 170,710.69 | | 226,830.88 | | 1,600,000.00 |

21. A bankruptcy court under the Act may not surcharge a legal advisor to the estate. *In re Red Carpet Corp. of Panama City Beach v. Miller,* 708 F.2d 1576, 1579 (11th Cir.1983). The purpose of the surcharge remedy is to allow recovery from a trustee or receiver who cannot be expected to sue himself to recover losses caused by his own negligence. *Id.* In contrast, a trustee or receiver may recover from a negligent legal advisor in an action outside the bankruptcy court. *Id.*

| Period Ended | Cash Receipts | Cash Disbursements | (Increase) Decrease in Investment | Account Balance EOM* | LaSalle Nat'l. Bank Checking** | Total Investment in CDs |
|---|---|---|---|---|---|---|
| 7–31–81 | 56,622.21 | 172,878.62 | | 110,574.47 | | 1,600,000.00 |
| 8–31–81 | 50.82 | 83,272.12 | | 27,353.17 | | 1,600,000.00 |
| 9–30–81 | | | | 27,353.17 | | 1,600,000.00 |
| 10–31–81 | 68,488.88 | 7,500.00 | 100,000.00 | 188,342.05 | | 1,500,000.00 |
| 11–30–81 | 16,141.66 | | | 204,483.71 | | 1,500,000.00 |
| 12–31–81 | | | | 204,483.71 | | 1,500,000.00 |
| 1–29–82 | | 56,607.15 | | 147,876.56 | | 1,500,000.00 |
| 2–26–82 | 52,299.16 | 2,991.50 | | 197,114.22 | | 1,500,000.00 |
| 3–31–82 | | 2,464.86 | | 194,649.36 | | 1,500,000.00 |
| 4–30–82 | | 435.80 | | 194,213.56 | | 1,500,000.00 |
| 5–28–82 | 52,380.20 | | | 246,593.76 | | 1,500,000.00 |
| 6–30–82 | | 53,982.54 | | 192,611.22 | | 1,500,000.00 |
| 7–30–82 | | 50,375.64 | | 142,235.58 | | 1,500,000.00 |
| 8–31–82 | 53,666.66 | 33,610.81 | | 162,291.43 | | 1,500,000.00 |
| 9–30–82 | | 1,327.30 | | 160,964.13 | | 1,500,000.00 |
| 10–31–82 | | | | 160,964.13 | | 1,500,000.00 |
| 11–30–82 | 40,250.00 | 435.80 | 1,500,000.00 | 1,700,778.33 | | 0 |
| 12–31–82 | | | (1,200,000.00) | 500,778.33 | | 1,200,000.00 |
| 1–31–83 | | 944.80 | | 499,833.53 | | 1,200,000.00 |
| 2–28–83 | | 391,289.11 | | 108,544.42 | | 1,200,000.00 |
| 3–31–83 | 25,124.99 | 174,731.08 | 400,000.00 | 358,938.33 | | 800,000.00 |
| 4–29–83 | | 691.19 | | 358,247.14 | | 800,000.00 |
| 5–31–83 | | 37,698.95 | | 320,548.19 | | 800,000.00 |
| 6–29–83 | 17,888.88 | | | 338,437.07 | | 800,000.00 |
| 7–29–83 | | | | 338,437.07 | | 800,000.00 |
| 8–31–83 | | 17,618.45 | | 320,818.62 | | 800,000.00 |
| 9–30–83 | 17,888.88 | | | 338,707.50 | | 800,000.00 |
| 10–31–83 | | | | 338,707.50 | | 800,000.00 |
| 11–30–83 | | 34.98 | | 338,672.52 | | 800,000.00 |
| 12–30–83 | 17,441.66 | | | 356,114.18 | | 800,000.00 |
| 1–31–84 | | | | 356,114.18 | | 800,000.00 |
| 2–29–84 | | | | 356,114.18 | | 800,000.00 |
| 3–30–84 | 18,705.55 | 44.45 | | 374,775.28 | | 800,000.00 |
| 4–30–84 | | 436.00 | | 374,339.28 | | 800,000.00 |
| 5–31–84 | | | | 374,339.28 | | 800,000.00 |
| 6–29–84 | 20,188.88 | | | 394,528.16 | | 800,000.00 |
| 7–31–84 | | | | 394,528.16 | | 800,000.00 |
| 8–31–84 | | | | 394,528.16 | | 800,000.00 |
| 9–28–84 | 22,488.88 | 197.74 | | 416,819.30 | | 800,000.00 |
| 10–31–84 | | | | 416,819.30 | | 800,000.00 |
| 11–30–84 | | 10,276.00 | | 406,543.30 | | 800,000.00 |
| 12–31–84 | 21,536.66 | 1,909.00 | | 426,170.90 | | 800,000.00 |
| 1–31–85 | | 10,866.00 | | 415,304.96 | | 800,000.00 |
| 2–28–85 | | | | 415,304.96 | | 800,000.00 |
| 3–29–85 | 16,250.00 | 436.00 | | 431,118.96 | | 800,000.00 |
| 4–30–85 | | | | 431,118.96 | | 800,000.00 |
| 5–31–85 | | | | 431,118.96 | | 800,000.00 |
| 6–28–85 | 16,866.66 | | | 447,985.62 | | 800,000.00 |
| 7–31–85 | | | | 447,985.62 | | 800,000.00 |
| 8–30–85 | | | | 447,985.62 | | 800,000.00 |
| 9–30–85 | 14,720.00 | 1,909.00 | | 460,796.62 | | 800,000.00 |
| 10–31–85 | | 675.00 | | 460,121.62 | | 800,000.00 |
| 11–29–85 | | | | 460,121.62 | | 800,000.00 |
| 12–31–85 | 15,166.66 | | | 475,288.28 | | 800,000.00 |
| 1–31–86 | | | | 475,288.28 | | 800,000.00 |
| 2–28–86 | | | | 475,288.28 | | 800,000.00 |
| 3–31–86 | 14,750.00 | 40.00 | | 489,998.28 | | 800,000.00 |
| 4–30–86 | | | | 489,998.28 | | 800,000.00 |
| 5–30–86 | | | | 489,998.28 | | 800,000.00 |
| 6–30–86 | 13,800.00 | | | 503,798.28 | | 800,000.00 |
| 7–31–86 | | 476.33 | | 503,321.95 | | 800,000.00 |
| 8–31–86 | | | | 503,321.95 | | 800,000.00 |
| 9–30–86 | 13,084.44 | 396.00 . | 800,000.00 | 1,316,010.39 | | 0 |

Balance unchanged through 5–29–87

\* End of Month.
\*\* The checking account at LaSalle National Bank was opend in March, 1979 and closed in June 1979.